NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

TRICOR PRODUCTS, INC., and/or C &
J Pattern Co., Respondent.

No. 79–1231.

United States Court of Appeals,
Tenth Circuit.

Argued Sept. 17, 1980.
Decided Nov. 14, 1980.

David A. Fleischer, Atty., John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, and Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C., for petitioner.

Harold B. Wagner, Denver, Colo., for respondent.

Before McWILLIAMS and BARRETT, Circuit Judges, and BOHANON, District Judge.*

McWILLIAMS, Circuit Judge.

The National Labor Relations Board seeks enforcement of its order issued against Tricor Products, Inc., and C & J Pattern Company. The Board's Decision and Order is reported at 239 N.L.R.B. 65 (1978) and attached thereto is the decision of the Administrative Law Judge. Background facts are fully set forth in the Ad-

ministrative Law Judge's decision and will only be repeated here insofar as is necessary to an understanding of our opinion. The main issue is whether the record supports the finding of the Administrative Law Judge that Tricor Products, Inc., is the *alter ego* of C & J Pattern Company.

The Pattern Makers League of North America, AFL–CIO filed charges against Tricor Products, Inc., and C & J Pattern Company.[1] The gist of the charges was that the Union was the duly recognized bargaining representative of the pattern makers employed by Tricor and C & J, and that the collective bargaining contract between the parties had been repudiated by the companies. It was further charged that commencing on or around April 1, 1977, the companies had discouraged its employees from continuing their membership in the Union by coercion, duress, threats, promises of benefits, and the like.

Thereafter, the General Counsel of the Board, acting through a Regional Director, issued a Complaint and Notice of Hearing to Tricor and C & J. The allegations of the complaint paralleled the charges earlier made by the Union. Specifically, it was alleged that C & J and the Union executed a collective bargaining contract covering pattern makers and apprentices on or about September 29, 1976, for the period from June 1, 1976, to May 31, 1978. It was further alleged that on or about April 20, 1977, Tricor purchased the physical assets, good will, and accounts receivable of C & J, and also assumed its liabilities, and that in so doing, Tricor became the *alter ego* of C & J. However, according to the complaint, Tricor determined to be non–union and refused to recognize that it had any obligation under the agreement between C & J and the Union and that it otherwise committed various acts constituting unfair labor practices.

By answer, Tricor admitted that C & J and the Union executed a collective bar-

---

* Of the United States District Court for the Northern, Eastern and Western Districts of Oklahoma, sitting by designation.

1. C & J Pattern Company was engaged in the pattern–making business until April, 1977, when it was merged into Tricor Products, Inc.

gaining agreement but alleged that the agreement terminated when C & J ceased doing business on April 15, 1977, and that the agreement was not assumed by Tricor. Tricor denied that it was the *alter ego* of C & J and denied that it had committed any unfair labor practices.

There was a full evidentiary hearing before an Administrative Law Judge, with some six persons testifying at length, including John Hussle, who was the president of Tricor and who had been sole proprietor of C & J in April, 1977.[2] As indicated, the Administrative Law Judge found, *inter alia*, that Tricor, under the circumstances, was the *alter ego* of C & J, and recommended that Tricor be ordered to "Honor, and comply with all the terms and conditions of the bargaining agreement between C & J and the Union . . . ." 239 N.L.R.B. at 71. On review, the Board affirmed the rulings, findings and conclusions of the Judge, and adopted his recommended order, with two minor modifications not pertinent here.

■ Tricor initially argues that there never was a valid and binding collective bargaining agreement between C & J and the Union. If we read the pleadings before the Board correctly, Tricor, however, *admitted* in its answer to the NLRB complaint that there was a collective bargaining agreement between C & J and the Union. C & J, which was represented by the same counsel as Tricor, also *admitted* in its answer that there was a collective bargaining agreement between it and the Union covering pattern makers. In this regard, the Administrative Law Judge found that until April 20, 1977, both C & J and the Union "recognized, worked under and honored the contract . . ." and concluded that under all these circumstances it was "too late" in the day to contend that there never was an agreement between C & J and the Union. We agree.

The real issue before us is whether the Board's finding that Tricor is the *alter ego* of C & J is supported by the record. We believe it is. We do not propose to here detail all of the findings of the Administrative Law Judge, later affirmed by the Board, which bear on the *alter ego* question. It is sufficient for our purposes to quote from the Judge's decision as follows:

> The facts that C & J and Tricor are separate legal entities and that the establishment of Tricor was economically motivated are irrelevant. For the purposes of this case, Tricor is the *alter ego* of C & J. As noted *supra*, Hussle is the principal force behind both C & J and Tricor. Hussle presently owns, with his wife, most of the stock of Tricor, and Hussle is the administrator of Tricor's affairs. Patternmaking is only a portion of Tricor's business, but that portion was the entire business of C & J; the latter firm was absorbed *in toto* by Tricor. C & J's closure, under such circumstances, does not relieve Tricor of responsibility for C & J's contract with the Union. Tricor assumed C & J's debts, liabilities, current business, customers, employees, machinery, and equipment, moved the entire operation to Tricor's new facility 11 miles away, and immediately picked up C & J's work where C & J had left off, with Hussle as the principal director and administrator at both locations. Clearly, C & J and Tricor are one and the same. 239 NLRB at 69.

■ Whether a second employer is the *alter ego* of an earlier employer, or merely a successor employer, requires a consideration of numerous factors and often presents a close question. The legal effect of such a finding, however, is well–settled. A mere successor employer generally is not bound by the terms and provisions of any agreement between a union and the predecessor employer, although the successor may under certain circumstances be required to bargain.[3] A second employer who is found to

---

2. Hussle earlier had been one of three partners of C & J, but by the time that C & J was taken over by Tricor in April, 1977, he had acquired the interests of his two partners.

3. In *N.L.R.B. v. Burns International Security Services, Inc.*, 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972), a case involving a successor rather than an *alter ego*, the Court found that the company, while it did have a duty to bar-

be the *alter ego* of the first employer, however, is bound by an agreement between the union and the first employer.[4]

As indicated, a determination as to whether a second employer is a mere successor to a first employer, or is its *alter ego*, involves a consideration of numerous factors. There is no hard-and-fast rule. If an employer makes changes in its business operation to deliberately get rid of the union, the employer is more likely to be an *alter ego*. If, however, the employer has legitimate economic reasons for the changes, and is not motivated by anti-union sentiment, the second employer is more likely to be deemed a mere successor to the first. In connection with this particular aspect, we think evidence of anti-union sentiment by an employer, occurring either before or after the change in the structure of the business, is germane.[5]

Another factor to be considered is the continuity of the work force. If the second employer continues with substantially the same employees, the second employer is more likely to be deemed an *alter ego* of the first. If, however, the second employer has a substantially different work force than did the first employer, the second employer is more likely to be deemed a mere successor.[6]

Another important consideration is the relationship, if any, between the management of the old company and that of the new company.[7] As the Supreme Court has put it: Was there a true change in ownership and management, or "merely a disguised continuance of the old employer"?[8] Closely related to this consideration are such factors as continuity of equipment and location, retention by the successor of accounts and customers, changes in the type and amount of work performed, and assumption of the predecessor's liabilities by the successor.[9]

Testing the record in the light of these various factors, we conclude that there is sufficient evidence to support the Board's finding that Tricor was the *alter ego* of C & J. When C & J went out of existence, Hussle was its sole owner. Another business entity was initially brought into Tricor by Hussle, but by the time the matter was heard by the Administrative

gain, was not obligated to assume the collective bargaining agreement negotiated between its predecessor and the union. *See also N.L.R.B. v. Band–Age, Inc.*, 534 F.2d 1 (1st Cir.), order enforced, 539 F.2d 701 (1st Cir.), *cert. denied*, 429 U.S. 921, 97 S.Ct. 318, 50 L.Ed.2d 288 (1976), and *N.L.R.B. v. Security–Columbian Banknote Co.*, 541 F.2d 135 (3d Cir. 1976).

4. E. g., *N.L.R.B. v. Sweet Lumber Co.*, 515 F.2d 785 (10th Cir.), *cert. denied*, 423 U.S. 986, 96 S.Ct. 393, 46 L.Ed.2d 302 (1975) and *Local 57, International Ladies' Garment Workers Union v. N.L.R.B.*, 374 F.2d 295 (D.C.Cir.), *cert. denied*, 387 U.S. 942, 87 S.Ct. 2078, 18 L.Ed.2d 1328 (1967).

5. We think the record here demonstrates anti-union bias by Hussle both before and after Tricor was formed. Hussle indicated to his employees before the change that the new business would operate a non-union shop. There also is evidence that he offered stock to employees in return for their abandonment of the Union. Significantly, the stock offer was not made to the employee who was the Union president, because of his Union ties.

6. This factor is discussed in *Howard Johnson Co. v. Hotel Employees*, 417 U.S. 249, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974), and *N.L.R.B. v.*

*Geronimo Service Co.*, 467 F.2d 903 (10th Cir. 1972).

7. *See, e. g., N.L.R.B. v. Bell Company, Inc.*, 561 F.2d 1264 (7th Cir. 1977), in which the Seventh Circuit found that an NLRB order could not be enforced against a successor employer where there was "a bona fide discontinuance [of the predecessor employer] and a true change in ownership . . ." *Id.* at 1267. In *Bell*, unlike the case at hand, all of the owners in the predecessor and successor companies were different individuals.

8. *Southport Petroleum Co. v. N.L.R.B.*, 315 U.S. 100, 106, 62 S.Ct. 452, 456, 86 L.Ed. 718 (1942). In *Southport*, the Court held that a company could not evade its obligations under the National Labor Relations Act by setting up what appears to be a new company but really is a "disguised continuance" of the employer which had an obligation to the Union. The Board relies in this situation on the precedent set in *Southport*.

9. The factors are discussed, in a successorship context, in *N.L.R.B. v. Ideal Laundry Corp.*, 422 F.2d 801, 802–03 (10th Cir. 1970).

Law Judge, Hussle and his wife owned most of the stock of Tricor. So, in reality, Hussle was first C & J and then Tricor. Thus, there was a continuity of ownership, as well as management. Also, Tricor absorbed C & J's employees and acquired C & J's machinery and equipment, as well as its pending orders. The fact that the switch from C & J to Tricor was motivated by economics, as the Administrative Law Judge found, does not alter the obvious fact that Hussle, who candidly admitted his anti–union sentiment, seized on the opportunity to rid himself of the Union. Under such circumstances, we are not at liberty to disturb the Board's finding that Tricor was the *alter ego* of C & J.

Our holding that there is sufficient evidence to support the finding that Tricor was the *alter ego* of C & J resolves the main issue in the case. As to other matters raised in this Court, our study leads us to conclude that all critical findings are supported by the record, and that the order of the Board squares with such findings.

 Brief word concerning a former employee, one Alysius Filipowicz, is perhaps in order. The Board found that Filipowicz was constructively discharged by Tricor. Tricor contends that the issue was not properly before the Board, since it was not alleged in the complaint and that, in any event, there was insufficient evidence to support a finding of constructive discharge. There is no merit to either point. It is well established that an issue which has been fairly tried by the parties may be decided by the Board regardless of whether it has been specifically pleaded. *N.L.R.B. v. Thompson Transport Co.*, 421 F.2d 154 (10th Cir. 1970). Filipowicz testified about the confrontation with Hussle which resulted in his termination of employment. As indicated, Hussle, who was a witness, did not challenge the accuracy of Filipowicz' testimony concerning the termination. It would appear that Filipowicz and Hussle were the only persons who could shed any light on the circumstances surrounding the termination of Filipowicz' employment. Under such circumstance, the Filipowicz matter was fully heard, and the issue was properly before the Board.

Furthermore, we believe that Filipowicz' testimony is sufficient to support a finding of constructive discharge. Filipowicz returned to work at Tricor after a vacation only to learn that the company would not only be non–union, but also, contrary to Hussle's earlier promises, would not pay union benefits. Rather than work under such conditions, Filipowicz quit. The law is settled that "where an employer deliberately makes an employee's working conditions intolerable and thereby forces him to quit his job because of union activities or membership, the employer has constructively discharged the employee in violation of § 8(a)(3) of the Act." *J. P. Stevens & Co. v. N.L.R.B.*, 461 F.2d 490, 494 (4th Cir. 1972) (citations omitted).

Enforcement is hereby ordered.