## NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

## FULLERTON TRANSFER & STORAGE LIMITED, INC.; Richard E. Mills; Carole F. Mills; Sllim Real Estate Corporation, Respondents.

### No. 89–5754.

United States Court of Appeals, Sixth Circuit.

Argued May 1, 1990.

Decided Aug. 7, 1990.

---

Aileen A. Armstrong, Deputy Associate Gen. Counsel, Barbara Atkin, Robert N. Herman (argued), N.L.R.B., Office of Gen. Counsel, Washington, D.C., Frederick Calatrello, Director, N.L.R.B., Region 8, Cleveland, Ohio, for petitioner.

Richard P. McLaughlin (argued), James F. Mathews, McLaughlin, McNally & Carlin, Youngstown, Ohio, for respondents.

Before KENNEDY and WELLFORD, Circuit Judges, and ENGEL, Senior Circuit Judge.

KENNEDY, Circuit Judge.

In this case, the National Labor Relations Board (the Board) seeks to enforce a backpay order originally entered and enforced against Fullerton Transfer & Storage Limited, Inc. (Fullerton Transfer), against its owners, Richard and Carole Mills, and a related corporation also owned and operated by the Mills. The Board concluded that the Mills and the related company, Sllim Real Estate Corporation (Sllim), are the alter egos of Fullerton Transfer. For the reasons stated below, we find that the Board erred in concluding that the Mills and Sllim are the alter egos of Fullerton Transfer and decline to enforce the Board's order against them.

Background

In a June 1976 decision and order, the Board found that Fullerton Transfer had committed a number of unfair labor practices by unilaterally changing pay rates, unilaterally discontinuing health and pension contributions, refusing to process a grievance under an established grievance procedure, and discharging 11 employees who were striking to protest these unfair labor practices. In subsequent proceedings, Fullerton Transfer was found liable for backpay, vacation pay, medical expenses, and pension fund contributions, totaling $21,968.81, plus interest that continues to accrue. Because Fullerton Transfer has gone out of business and liquidated its assets to pay other creditors, none of this award has ever been satisfied.

Fullerton Transfer began as an unincorporated family owned and operated storage and moving company founded by Carole Mills' parents. Carole Mills inherited the moving business after her mother's death in 1955. From this time until the company ceased operations in 1978, it was run by Carole's husband, Richard Mills. In 1960, the business, which had operated as one entity, was divided between two separate legal entities, Fullerton Transfer Inc. and Fullerton Equipment Inc. Carole Mills continued to own the operation's real estate. Carole Mills later incorporated the real estate portion of the business as well, forming Sllim. It is undisputed that this division into separate corporations occurred in order to insulate the Mills and the assets of each corporation from any future unforeseen liabilities not covered by company insurance. The now incorporated Fullerton Transfer became the operating company that actually hired drivers and entered into moving and storage contracts. Carole Mills received approximately 97% of its stock and Richard Mills the balance. Fullerton Transfer's assets, other than cash and accounts receivable, were limited to licenses, office furniture, and incidental equipment used in its moving operations. Until the strike in 1975 that ultimately brought about the demise of the company, Fullerton Transfer's primary place of business was a terminal and warehouse in Youngstown, Ohio. Sometime after the strike, Fullerton Transfer scaled back its operations. Richard Mills ran this more limited operation from his home until it ceased business in 1978.

Fullerton Equipment was also established in 1960. The title to the enterprise's fleet of trucks was transferred to Fullerton Equipment at that time. These trucks were in turn leased back to Fullerton Transfer. To the extent Fullerton Equipment had any business of its own, the business was conducted by Richard Mills from the premises leased by Fullerton Transfer.

Although most other assets were transferred to the newly established corporations in 1960, Carole Mills continued personally to own the real estate and buildings

used by Fullerton Transfer under a written lease. In 1971, the Mills founded Sllim as a real estate holding corporation. Carole Mills transferred the property used by Fullerton Transfer subject to an outstanding mortgage to Sllim in return for Sllim stock. Virtually all of the real estate owned by Sllim at the time of the strike was leased to Fullerton Transfer.[1] Some of the stock has been transferred to the Mills' children pursuant to an estate plan. While Richard Mills is now deceased, the family apparently continues to direct Sllim's activities.

Throughout its existence, Fullerton Transfer never paid dividends to its shareholders and rarely had taxable income. The Mills received income from the company through salary and ultimately by reason of lease payments made to the two other corporations they controlled, Fullerton Equipment and Sllim. Nevertheless, the Board did not find that the salaries paid to the Mills or the lease agreements with Sllim or Fullerton Transfer were out of line with the prevailing market prices.[2] Thus, there is no reason to conclude that the Mills manipulated their salaries and leases in order to maintain Fullerton Transfer as a judgment-proof corporation.

The Board also found that the Mills had not commingled their personal assets or the assets of Sllim with Fullerton Transfer's assets. There was a degree of financial interaction between the two companies and the Mills, however. Although Fullerton Transfer was able to take out short term loans to meet payroll without any personal guarantees by the Mills, it had difficulty acquiring long term loans. The one long term commercial loan outstanding at the time Fullerton Transfer ceased operations was personally guaranteed by the Mills at the insistence of the lending institution.[3] After the company ceased operations, the Mills were required to begin paying Fullerton Transfer's obligation on this loan under the guarantee. Richard Mills also admitted that he and his wife occasionally personally made small loans to the corporation, some of which were not repaid.[4]

Richard Mills began to wind down Fullerton Transfer's operations in 1975 after the unfair labor practice strike crippled its operations. The company voluntarily relinquished its agency agreement with North American Van Lines, a major source of business, and vacated the property it had rented from Sllim. Fullerton Equipment also went out of business, selling off the trucks it had formerly rented to Fullerton Transfer. Two of Fullerton Transfer's supervisors eventually formed a new company which began moving and storage activities on the same location. They also received the North American Van Lines agency agreement which Fullerton Transfer had relinquished.[5]

Fullerton Transfer ceased operations with many of its outstanding debts unpaid. In winding down Fullerton Transfer's affairs, Richard Mills was able to raise an additional $50,000 from the sale of company assets and collection of the company's accounts receivable. Mills used all of this money to satisfy the company's creditors, often negotiating steep reductions in the company's debts as a condition for pay-

1. Sllim occasionally invested in other properties—primarily residential dwellings—not leased to Fullerton Transfer.

2. The Administrative Law Judge (ALJ) found that Richard Mills increased his salary from Fullerton Transfer in the last years of the company's operations. The Board specifically noted that it did not rely on this finding however.

3. The record suggests that earlier long term loans taken out by Fullerton Transfer were also guaranteed by the Mills. These loans were apparently paid prior to the company's demise in 1978.

4. From the context of these remarks, it appears that the loans not repaid were those outstanding at the time the company ceased doing business. There is also some suggestion in the record, but not in the ALJ's findings, that Sllim made loans to Fullerton Equipment. As with many of the other financial questions, it was difficult for the Mills positively to determine what loans were made and what loans were repaid since many of the financial records of the company had been damaged both during the strike and after the company ceased operations.

5. The new operation was not made a party to the action to enforce the Board's backpay and benefit orders. There is no claim that the Mills had any interest in the new company.

ment. The company did not use this money to pay off any of the outstanding lease payments owed to Sllim. Richard Mills considered these debts low on the list of priorities. Further, there is no evidence in the record to support a conclusion that the Mills used any of this money to reduce the principal on the outstanding loan which they had guaranteed. It is unclear how Richard Mills decided which of the corporation's obligations to pay off. Although the ALJ determined that it was Mills' intent to protect his family's reputation in the community, the record is somewhat ambiguous. It is clear that the Mills and Sllim did not assume any debts which their prior guarantees did not require them to assume. Further it is undisputed that many creditors in addition to the employees were never paid.

Fullerton Transfer did not file for bankruptcy protection. Moreover, it did not take any other action, such as setting aside money for future debts, which would guarantee that the final backpay order would be satisfied. The original backpay specification was not entered until October 1977, however, and not enforced by this Court until March 26, 1981. Thus, by the time the proceedings were final, the company's assets had been exhausted.

Based on these findings of fact, the Board concluded that Sllim and the Mills were alter egos of Fullerton Transfer. In finding Sllim to be an alter ego, the Board relied primarily on the fact that Sllim and Fullerton Transfer were organized in an attempt to insulate assets from any future unanticipated judgments against Fullerton Transfer not covered by the company's insurance. In finding the Mills liable, the Board relied primarily on the fact that the Mills guaranteed a portion of the corporation's debt, made loans to the corporation without seeking repayment, and personally made the decision that Fullerton Transfer and Fullerton Equipment would cease operations. The Board did not seek any payment from Fullerton Equipment because it too had gone out of business without any assets.

## Discussion

■ Whether a company or individual is responsible for the financial obligations of another company or individual is a question of federal law when it arises in the context of a federal labor dispute. Although state law cases may provide guidance in fashioning the content of federal law, they are not binding and thus do not control the outcome of this case. *See e.g., Contractors, Laborers, Teamsters and Engineers Health and Welfare Plan v. Hroch,* 757 F.2d 184, 190 (8th Cir.1985); *Seymour v. Hull & Moreland Engineering,* 605 F.2d 1105, 1109 (9th Cir.1979). Thus we do not believe that the respondents' citations to Ohio law are controlling.

Nevertheless, like state law, federal law generally recognizes the limitation of liability that the adoption of a corporate form creates. As the Supreme Court has stated, "The insulation of a stockholder from the debts and obligations of his corporation is the norm, not the exception." *NLRB v. Deena Artware, Inc.,* 361 U.S. 398, 402–03, 80 S.Ct. 441, 443–44, 4 L.Ed.2d 400 (1960). A similar statement could be made concerning the liability of an affiliated corporation for the debts and obligations of its affiliate. Exceptions to this rule may arise in at least three ways. First, Congress could create an explicit statutory exception to a corporation's limited liability, something it has not done. Second, an exception broader than that recognized by federal common law could be found in order to effectuate Congressional labor policies. *See e.g., First National City Bank v. Banco Para el Comercio Exterior de Cuba,* 462 U.S. 611, 629–30, 103 S.Ct. 2591, 2601–02, 77 L.Ed.2d 46 (1983); *Laborers' Pension Trust Fund v. Sidney Weinberger Homes, Inc.,* 872 F.2d 702, 705 (6th Cir.1988); *Alman v. Danin,* 801 F.2d 1, 3 (1st Cir.1986); *Town of Brookline v. Gorsuch,* 667 F.2d 215, 221 (1st Cir.1981). Finally, the more narrow federal common law exception to corporate limited liability may be applied to allow the Board to go behind the corporate form.

■ The parties have argued this case under various labor law and non-labor versions of the alter ego doctrine. Although

in a strict sense this case does involve the application of alter ego principles, the label itself is of little help in resolving the issues presented. Rather, we must determine which doctrine referred to as an "alter ego doctrine" applies to this case. The term "alter ego" has accumulated a great deal of baggage in the context of labor disputes. The alter ego doctrine is most commonly used in labor cases to bind a new employer that continues the operations of an old employer in those cases where the new employer is "merely a disguised continuance of the old employer." *Southport Petroleum, Co. v. NLRB,* 315 U.S. 100, 106, 62 S.Ct. 452, 456, 86 L.Ed. 718 (1942); *see also Howard Johnson Co. v. Detroit Local Joint Executive Bd., Hotel and Restaurant Employees, and Bartenders Int'l Union,* 417 U.S. 249, 259 n. 5, 94 S.Ct. 2236, 2242 n. 5, 41 L.Ed.2d 46 (1974).[6] Increasingly, the term also is applied to so-called double-breasted operations to determine whether two or more coexisting employers performing the same work are in fact one business, separated only in form.[7] In both instances, the Board has formulated the test as "whether the two enterprises have substantially identical management, business, purpose, operation, equipment, customers, supervision and ownership." *Nelson Electric v. NLRB,* 638 F.2d 965, 968 (6th Cir.1981); *see also NLRB v. Allcoast Transfer, Inc.,* 780 F.2d 576, 579 (6th Cir.1986). "We also have observed that it is the Board's function to 'strike a balance among each of the criteria' set forth above." *Allcoast Transfer,* 780 F.2d at 579 (quoting *Nelson Electric,* 638 F.2d at 968).[8] In order to effectuate federal labor policies, the courts and the Board have applied this version of the alter ego doctrine in a more relaxed, less exacting fashion than would be required under federal common law principles. Although many of the cases could also be explained under a federal common law doctrine, it is not this standard that the courts have sought to apply.

The Board argues that the relaxed alter ego standard applicable in double-breasted operation and disguised continuance cases applies to the case before us. We cannot agree. Even a cursory examination of the facts in this case reveals that Sllim and the Mills have a very different

---

**6.** The successorship doctrine is often confused with the alter ego doctrine. The successorship doctrine is used to determine whether a new employer has an obligation to bargain when there is a bona fide sale of the employing company. A bona fide sale is found when there is "any substantial change in ... ownership or management." *See Howard Johnson,* 417 U.S. at 259 n. 5, 94 S.Ct. at 2242 n. 5. Although a successor at most may be required to bargain with the prior union, a new corporation that is the alter ego of the employer it replaced will be held to all of the prior employer's agreements and obligations.

**7.** Double-breasted operations arise in those cases where a company operating with a unionized work force establishes a second, nonunionized company performing the same work in the same market under the same control.

Double-breasted operations are also attacked using the single-enterprise doctrine. This doctrine was originally developed to determine if two or more corporations too small to meet the Board's jurisdiction requirements fall within the Board's jurisdiction. A court examines four factors under this test, (1) the interrelation of operations, (2) the centralized control of labor relations, (3) common management, and (4) common ownership or control. *See Radio & Television Broadcast Technicians Local Union*

*1264 v. Broadcast Serv. of Mobile, Inc.,* 380 U.S. 255, 85 S.Ct. 876, 13 L.Ed.2d 789 (1965). If the requirements are met in a jurisdiction case, then jurisdiction is established. If the requirements are met in an unfair labor practice dispute where one of the two companies has already signed a bargaining agreement, then the second company may be bound by the same agreement. *South Prairie Constr. Co. v. Local 627, Int'l Union of Operating Eng'rs,* 425 U.S. 800, 802–04, 96 S.Ct. 1842, 1843–44, 48 L.Ed.2d 382 (1976). The question of whether the two corporations belong in the same bargaining unit remains, however.

**8.** These factors were first enunciated by the Board in *Crawford Door Sales Co.,* 226 N.L.R.B. 1144 (1976), a disguised continuance case in which the original company was dissolved and a new nonunion company formed to take its place. Although the Board originally limited the application of this test to cases where the original company had ceased operations, over time, the Board and the courts began to apply this test where the original union firm continued as a viable operation. *See* Befort, *Labor Law and the Double–Breasted Employer; A Critique of the Single Employer and Alter Ego Doctrines and a Proposed Reformulation,* 1987 Wis. L.Rev. 67, 91–92.

relationship with Fullerton Transfer than do alter egos in double-breasted operation or disguised continuance cases. Unlike the alter egos in those types of cases, the alleged alter egos here are not companies engaged in the same business as the original company made subject to the Board's order. Rather, they are, respectively, a corporation engaged in a different business and stockholders and officers of another corporation.

Because of this different relationship, the rationales that justify the application of more relaxed alter ego principles in double-breasted operation and disguised continuance cases are absent here. As it is used in double-breasted operation and disguised continuance cases, the alter ego doctrine "was developed to prevent employers from evading obligations under the Act merely by changing or altering their corporate form." *Allcoast Transfer*, 780 F.2d at 579. Though intent to thwart a board order or statutory requirement is an important criteria, this Circuit has not required such a showing of employer intent in order to apply the liberalized alter ego standard. *Id.* at 581–82. Nevertheless, we have justified that position, which is followed by some, but not all, of the other circuits,[9] by reasoning that intent can too easily be disguised. "[A]n employer who desired to avoid union obligations might be tempted to circumvent the doctrine by altering the corporation's structure based on some legitimate business reason, retaining essentially the same business, and utilizing the change to escape the unwanted obligations." *Id.* at 582. Thus, like other circuits, our Circuit has relied on an employer's ability to thwart union obligations as the basis for our decision to enforce the more relaxed standard. Here, by contrast, the separation of the business into multiple corporations occurred long before the backpay award was ordered by the Board. Since Sllim and Fullerton Equipment had no employees that would have been covered under the Teamster's contract with Fullerton Transfer, it cannot be argued that their formation occurred to shift work from unionized to nonunionized employees. The Board concedes as much in its opinion below and its brief to this Court. Similarly, the separation occurred long before the unfair labor practices that are the subject of the Board's actions. The Board concedes the changes were not made in anticipation of committing or to further the commission of unfair labor practices by Fullerton Transfer.

Other cases and commentaries have presented two additional justifications for applying the more relaxed alter ego standard even absent a showing of intent. First, it is asserted that when an employer establishing a new firm enjoys the benefits of a change in form, it should expect to bear the burdens as well, regardless of intent to evade. *See Alkire v. NLRB*, 716 F.2d 1014, 1022 (4th Cir.1983) (Sprouse, J., dissenting); Befort, *supra*, note 8 at 97. Were this rationalization applied to every change of form, limited liability would never exist in a labor case, a result we do not support. It is more likely that the benefits contemplated by this rationale are benefits resulting from the avoidance of union obligations. Here, since there were no union obligations avoided when the separation occurred, there is no corresponding benefit that would trigger alter ego obligations. Second, requiring a showing of motive can often ignore legitimate contractual expectations of workers who have entered into a contract with the first employer. Befort, *supra*, note 8 at 99 (rejecting a required showing of motive and formulating a new

---

9. The Second Circuit has adopted the same position as our Circuit. *Goodman Piping Products, Inc. v. NLRB*, 741 F.2d 10 (2d Cir.1984). The First, Third, and Eighth Circuits require proof of an antiunion motive. *Iowa Express Distribution, Inc. v. NLRB*, 739 F.2d 1305 (8th Cir.), *cert. denied*, 469 U.S. 1088, 105 S.Ct. 595, 83 L.Ed.2d 704 (1984); *NLRB v. Al Bryant, Inc.*, 711 F.2d 543 (3d Cir.1983), *cert. denied*, 464 U.S. 1039, 104 S.Ct. 699, 79 L.Ed.2d 165 (1984); *Penntech*

*Papers, Inc. v. NLRB*, 706 F.2d 18 (1st Cir.), *cert denied*, 464 U.S. 892, 104 S.Ct. 237, 78 L.Ed.2d 228 (1983). Finally, the District of Columbia, Fourth, and Tenth Circuits adopt positions somewhere in between the two extremes. *Fugazy Continental Corp. v. NLRB*, 725 F.2d 1416 (D.C.Cir.1984); *Alkire v. NLRB* 716 F.2d 1014 (4th Cir.1983); *NLRB v. Tricor Products, Inc.*, 636 F.2d 266 (10th Cir.1980).

test for when double-breasted operations will be bound). Because of the longstanding nature of the division of asset ownership challenged in this case, the Board can hardly argue the employees had a contractual expectation that the Mills would satisfy Fullerton Transfer's debts from resources not owned by the corporation. The business of owning and leasing real estate is not an integral function of the trucking business. Many such businesses rent from strangers.

The Board, citing *Watt Electric Co.*, 273 N.LR.B. 655 (1984), argues the Mills' purpose to limit their personal liability and protect the assets of the business from any unforeseen future contingencies justifies the application of the more relaxed standard to bind Sllim.[10] Initially, we note that *Watt Electric* does not stand for this proposition. *Watt Electric* involved a very different situation from the case before us. Although there was an asset holding company that leased property to the alter ego in that case, the similarities end there. In *Watt Electric*, the alter ego was established when the company it succeeded became unprofitable because of the union wages it paid. The original company discharged its workers and became an operation that existed solely to service its mortgages and rent its equipment to the new alter ego, which performed the work of the old company but did not pay union scale. In the case before us, by contrast, the bifurcation of asset ownership and day-to-day operation was not created to avoid a bargaining obligation. It was created long before unfair labor practice charges against the corporation were foreseeable.

■ Moreover, we do not believe that the Mills' desire to limit liability provides any support for the proposition that the more relaxed labor law alter ego standard

should be applied to the facts of this case. Virtually all corporations are formed for the purpose of limiting liability. Only where an attempt to limit liability is of a type that typically involves a specific attempt to thwart labor law obligations is the application of relaxed alter ego principles justified. Where a case does not involve such facts, the more relaxed standard cannot apply.[11]

It does not appear that the Board has attempted to bind the Mills under the more liberal alter ego standard applied to double-breasted operation and disguised continuance cases. Nevertheless, to the extent this is the Board's argument, we reject it. Even were a liberal alter ego doctrine applicable to Sllim, it would not apply or operate to bind the Mills. The liberal alter ego doctrine is used to bind divided businesses, not the individuals who own stock in those businesses. Only if those divided businesses are not operated as corporations are the owners personally bound. Here, Fullerton Transfer and the other businesses were operated by the Mills in a corporate capacity. Accordingly, the Mills would still be entitled to the protection afforded by the corporate nature of their holdings absent some reason to pierce the corporate veil to reach them.

■ The question of what rule does apply in cases where an enterprise's operating structure has been created for the purposes of limiting liability remains. As already discussed, we do not believe that the Board has identified an overriding federal labor policy interest that requires an alter ego rule broader than that recognized under federal common law. Accordingly, the Board must rely on more traditional alter ego principles if its order is to be enforced against Sllim and the Mills. However, we

---

**10.** Essentially the Board asserts that the entire enterprise of the three companies, Fullerton Transfer, Fullerton Equipment, and Sllim, should be liable for the judgment. The Board does not appear to recognize that even under this theory the Mills would still not be personally liable for the award.

**11.** Although the Board did not so find, there is also no basis for concluding that the assets of

Fullerton Transfer and Sllim are so intermingled as to make the enterprise one company. Although both corporations were run from the same office, they apparently kept all of their accounts separate. The lease arrangements between the two were always in writing and apparently adhered to except for the failure to pay the rent in the final period in which Fullerton Transfer was insolvent.

can find no basis on which Sllim or the Mills are liable under federal common law alter ego standards either. Though there is no one test that governs when one corporation will be found to be the alter ego of another, the Supreme Court has provided a good summary of many of the tests:

> [A]s Mr. Justice Cardozo said in *Berkey v. Third Avenue R. Co.*, 244 N.Y. 84, 95, 155 N.E. 58, 61 "Dominion may be so complete, interference so obtrusive, that by the general rules of agency the parent will be a principal and the subsidiary an agent. Where control is less than this, we are remitted to the tests of honesty and justice." That is not a complete catalogue. The several companies may be represented as one. Apart from that is the question whether in fact the economic enterprise is one, the corporate forms being largely paper arrangements that do not reflect the business realities. One company may in fact be operated as a division of another; one may be only a shell, inadequately financed; the affairs of the group may be so intermingled that no distinct corporate lines are maintained. These are some, though by no means all, of the relevant considerations as the authorities recognize.

*Deena Artware*, 361 U.S. at 403–04, 80 S.Ct. at 443–44 (footnotes omitted).

The Board argues that Sllim and Fullerton Transfer are largely "paper arrangements that do not reflect the business realities" and that only one economic enterprise exists. In support of this proposition, the board asserts that "[t]he three corporations [Fullerton Transfer, Fullerton Equipment, and Sllim] therefore functioned together to enable Fullerton Transfer to provide its trucking and moving services to the public, while limiting its assets and potential liability to creditors and others." The Board also asserts that further support is found in the fact that Fullerton Transfer was undercapitalized to make it judgment proof, that Sllim was one of the two corporations used to hide Fullerton Transfer's

assets, and that the Mills, when winding down Fullerton Transfer's business, did not consider the payment of rents due Sllim of high priority.

Although it is true that Sllim provided terminal facilities under its lease which enabled Fullerton Transfer to provide trucking and storage services, we do not believe that this leads to the conclusion that Sllim and Fullerton Transfer should be treated as one for liability purposes. For this conclusion to follow, we believe the board must show that Fullerton Transfer could not have operated in the same fashion without the aid of Sllim.[12] Such a conclusion is not supported by this record.

The evidence that was before the Board suggests that Fullerton Transfer paid rents to Sllim and Fullerton Equipment at prevailing market rates. If this is the case, then Fullerton Transfer could have rented land and trucks from Corporations not owned and controlled by the Mills. Although the Board seeks to characterize Fullerton Transfer as perpetually undercapitalized, the record supports the opposite conclusion. Until the labor dispute that is the subject of this case, Fullerton Transfer was a successful enterprise. It met its bills, paid its salaries, and seemingly provided its owners with a living. Although the Board complains that the corporation never paid dividends, this is true for many closely held corporations. The Mills made their living from the corporation by receiving a salary for work performed on behalf of the corporation. There is no claim that these salaries were inflated or otherwise inappropriate.

Finally, the fact that the Mills did not consider the payment of rent due Sllim of high priority when winding down Fullerton Transfer's business is understandable. There were many outstanding bills to be paid at this time. While the Mills could not control the demands of other creditors, they could control the demands made by their own company. Moreover, if this evi-

---

12. Although the Board refers to Fullerton Equipment in its discussion, we find it unnecessary to discuss whether it should be liable under an alter ego theory since it no longer exists. Evidence regarding Fullerton Equipment is relevant, however, insofar as it discloses intent, or bears on the manner in which Fullerton Transfer or Sllim were operated.

dence provides support for either side, it is for the Mills. Had Richard Mills used his corporate position to pay rent to Sllim to the exclusion of payments to other creditors, then Sllim—a creditor controlled by the Mills—might have received an unjust preference that would justify holding Sllim or the Mills personally liable for the back-pay award.

Similarly, we see no basis for concluding that Sllim should be bound in the interests of justice or to prevent fraud. There is no claim that the employees were misled into believing that Fullerton Transfer owned the trucks and land. Further, there is no basis for any assertion that the rents paid were manipulated in order to keep the company insolvent. Accordingly, we can find no basis on which the Board was justified in holding Sllim to be the alter ego of Fullerton Transfer.

 The Board cites several factors in support of its decision finding the Mills personally liable. Although there is no one test for deciding when to disregard the corporate form and bind the owner-operators of a closely held corporation, most cases can be decided by reference to three factors first enunciated by a panel of the Ninth Circuit:

> Viewing the jumble of federal decisions together, we find a sort of generalized federal substantive law on disregard of corporate entity which concentrates on three general factors: the amount of respect given to the separate identity of the corporation by its shareholders, the degree of injustice visited on the litigants by recognition of the corporate entity, and the fraudulent intent of the incorporators.

*Seymour*, 605 F.2d at 1111; *see also Weinberger Homes*, 872 F.2d at 704–05.[13] Later Ninth Circuit decisions have tended to read *Seymour* as requiring that all three of these factors be present. *See, e.g., Operating Engineers Pension Trust v. Reed*, 726 F.2d 513, 515 (9th Cir.1984); *Audit Services, Inc. v. Rolfson*, 641 F.2d 757, 764 (9th Cir.1981). When fraud is shown, we do not believe that it is always necessary to show the other two factors. Similarly, if both injustice and little respect for the corporate entity are shown, we do not believe it necessary to show fraud. Where extraordinary injustice is shown, it may alone be a sufficient predicate to liability.

The Board does not appear to argue that fraud is present in this case. Clearly, the evidence does not support it. There is no showing that the Mills represented the company as anything other than a corporation. The fact that banks sought separate and specific guarantees from the Mills for the repayment of loans suggests that others did in fact believe Fullerton Transfer operated as a corporation.

Turning to the first factor, the Board asserts that it could reasonably conclude that no respect was given to the corporate form. The board cites three factors in support of this position: (1) the Mills personally guaranteed some of Fullerton Transfer's debts; (2) the Mills placed low priority on the repayment of these loans when winding up the company's affairs; and (3) the Mills did not seek repayment for the outstanding rents due to Sllim when winding up the company's affairs. We do not believe any of these factors support the finding that the Mills paid no respect to the corporate formalities. The personal guarantees they gave for some of the corporation debts suggest just the opposite. Although it is true that when winding up the company's affairs the Mills did not pay rent due Sllim and did not place priority on the loans they personally guaranteed, this alone does not suggest that the corporate form was ignored. Nor does this demon-

---

13. Most of the factors cited by other courts are merely fact specific restatements of these factors. These fact specific factors include, but are not limited to:

 undercapitalization of the corporation, the maintenance of separate books, the separation of corporate and individual finances, the use of the corporation to support fraud or illegality, the honoring of corporate formalities, and whether the corporation is merely a sham.

 *Weinberger Homes*, 872 F.2d at 704–05. Thus, there will be few federal common law alter ego cases where tests other than this one should be applied.

strate that the financial affairs of the corporation were intertwined with those of the Mills as asserted in the Board's brief to this Court. At most, this suggests that the Mills failed to satisfy the least demanding creditors, themselves. Paying themselves first would be more indicative of ignoring the corporate structure and acting in their personal interest. The most important factors one would expect to find—the intermingling of assets and the failure to maintain corporate records—are absent.[14]

■ The record also contains no evidence to support the Board's conclusion that an injustice would result from the failure to find the Mills liable. The mere fact that the company ceased operation without being able to pay all of its debts is, of course, not the sort of injustice contemplated. *Scarbrough v. Perez,* 870 F.2d 1079, 1084 (6th Cir.1989); *see also Hroch,* 757 F.2d at 191. This form of injustice, if that is the correct term for it, is present in every case. Again the Board relies on a number of factors to support this conclusion: (1) the Mills deliberately undercapitalized Fullerton Transfer and kept it judgment proof (2) Richard Mills failed to set aside money to pay the backpay obligations and failed to institute bankruptcy proceedings to protect all creditors; (3) Fullerton Transfer had little income after expenses and paid no dividends; (4) Richard Mills, acting on behalf of the corporation, committed the unfair labor practices that resulted in the liability; (5) Richard Mills personally decided to cease Fullerton Transfer's operations; and (6) the complete unity of management and ownership in the Mills is inconsistent with the recognition of the corporate form.

As to the first assertion, there is no evidence in the record to suggest that Fullerton Transfer was undercapitalized. The corporation apparently operated as a solvent and healthy corporation for more than 12 years after its incorporation. Although unable to meet all of its financial obligations when it ultimately went out of business, the only conclusion supported by the evidence in the record is that the closure and inability to pay debts resulted from Fullerton Transfer's labor troubles, not from any alleged undercapitalization. As already pointed out, it appears that Fullerton Transfer operated much as any other company which did not own its own trucks and warehouse. Since Fullerton Transfer could have operated in the same fashion without the Mills owning and operating Sllim and Fullerton Equipment, then the division of the operation to protect assets is not inherently unjust.

The mere fact that Richard Mills failed to institute bankruptcy proceedings when winding up the company's affairs and failed to set aside money to pay the still contested backpay award is also not evidence of unfairness in our opinion. There is no affirmative obligation on an insolvent debtor to file for bankruptcy. Although the Mills did not set aside money to pay the outstanding backpay award when winding up Fullerton Transfer's affairs, on the facts before us in this case, this does not appear to be the sort of abuse that would justify disregarding the corporate form. Apparently, many creditors were not paid. Those that were paid apparently agreed to reduce the debts they were owed. Most importantly, at the time the Mills were liquidating the company's assets and paying creditors, the Board's order had not yet been reduced to a certain amount and had not been enforced by this Court. Richard Mills began to wind down the company's affairs in 1977, a process that was completed in 1978. The Regional Director did not issue his original backpay specifications until October 1977. After a hearing and initial determination of the amount of backpay liability by an ALJ in May 1978, the Board reviewed the order and issued its initial decision in August 1979. The final order of the Board that included all the amounts due was not issued until March 1980 and not enforced by this Court until March 1981. Given the status of the back-

---

**14.** Although the Mills were able to provide few corporate records to the Board at the time of the proceedings, the records apparently once existed. The Mills' inability to provide the records was explained. *See supra* note 4. Moreover, the Board specifically refused to draw any negative inferences from this failure.

pay obligation at the time the corporation exhausted its assets in paying off creditors, it is impossible to say that Richard Mills, in not setting aside funds, committed an act of such manifest injustice as to justify holding him personally liable.

That the Mills did not receive dividends but instead profited from operating Fullerton Transfer through the receipt of reasonable salaries and the payment of reasonable rents to Fullerton Equipment and Sllim is also not evidence of injustice. Paying salaries, paying rent, and renting equipment are common and accepted practices among small, owner-operated businesses. Absent evidence that the Mills impermissibly siphoned off assets or paid inflated salaries or rents, no injustice is shown.

None of the final four explanations advanced by the Board are reasons to ignore the corporate form. Instead, they appear to reflect a belief that small, owner-operated enterprises should not be allowed to operate in a corporate form. Such owner-operated corporations are not only a common business structure in this country, but have always been recognized as a method of limiting even a small business owner's personal liability. Although it is true that owner-operated businesses are more likely to commit acts that will lead courts to find the owners personally liable, liability under a common law doctrine cannot be premised on the owner-operated status of the business itself. Thus it is irrelevant that the Mills made decisions on behalf of the corporation and that there was a unity of management and ownership in the Mills.

### Conclusion

For all of the above stated reasons, enforcement of the Board's order against Richard Mills, Carole Mills, and Sllim Real Estate Corporation is denied.

ENGEL, Senior Circuit Judge, concurring.

After reviewing the entire record as a whole in these proceedings, I had originally reached the conclusion that although the case was close, we were probably obliged to enforce. At the same time I realized, as Judge Kennedy has pointed out, that "the insulation of a stockholder from the debts and obligations of his corporation is the norm, not the exception." NLRB v. Deena Artware, 361 U.S. 398, 402–03, 80 S.Ct. 441, 443–44, 4 L.Ed.2d 400 (1960). Thus our analysis begins with the premise that there is nothing illegal or immoral with the well-established legal principle that individuals can create corporate entities through which to undertake and also to limit risk of personal responsibility for their private enterprises. This scheme encourages commerce and the expansion of trade, and it is difficult to find evil in an institution of such long standing and which finds its lawful use openly accepted and encouraged by jurisdictions throughout the world. I was also impressed by the fact that the Mills seem to have organized and carried on their businesses in a manner singularly free of any ulterior motivation which ran afoul of the general notions of corporate law and valid limitations of liability. Particularly, the openness with which the various corporate entities were handled, the care taken not to intermingle assets, and the entire absence of any fraud were most indicative of a legitimate use of the corporate form to achieve legitimate personal objectives, including insulation of liability and even more importantly, achievement of family estate planning objectives. Equally important to me was the fact that the separate corporations whose validity the Board sought to override had been created well before the labor difficulties in this case arose. Nonetheless, I was initially inclined to enforce the Board's order because of the deference which is customarily accorded to Board decisions. Further, the Board here had articulated reasons which at least plausibly supported the theory that Sllim was an alter ego of Fullerton Transfer, and that respondents had deliberately set about to create a corporate structure which would protect them and their corporate holdings from future liability, including liability from labor difficulties. As the son-in-law and daughter of the founder of North American Van Lines and as operators in a highly unionized field of business, the Mills

undoubtedly knew the trucking business well and were well-versed in labor and corporate law. Thus, the Board's determination that the rather complex corporate structure of the Mills' transfer enterprise was erected and maintained simply to enable them to evade future liability such as that from violations of the National Labor Relations Act could support a holding that their corporations were in fact alter egos.

Where I finally have come to agree with the majority has been in my realization that no particular deference is due to the Board's alter ego conclusion to the extent that it answers a question of law beyond the Board's expertise. Unlike purely factual conclusions by the Board, this conclusion is not entitled to deference on appeal. *See Seafarers Local 777 v. NLRB*, 603 F.2d 862, 869 n. 17, 872 (D.C.Cir.1979) (special deference accorded to the Board's legal conclusions on questions of law under the National Labor Relations Act does not extend to what is essentially an interpretation of the common law of agency); *see also Oil, Chemical and Atomic Workers Local 1–547 v. NLRB*, 842 F.2d 1141, 1144 n. 2 (9th Cir.1988) (retroactive application of a new standard under the Act is a question of law beyond the Board's special competence and subject to *de novo* review); *NLRB v. Better Building Supply Corp*, 837 F.2d 377, 378 (9th Cir.1988) (no special deference to the Board's interpretation of the Bankruptcy Code).

I therefore conclude that we are free to examine the entire transaction and to decide for ourselves upon the record that the corporate history of the several companies owned and operated by the respondents was proper and in accordance with normal precepts of American corporation law in general and the federal common law in particular. Having recognized this, I simply have to conclude that the record does not support a conclusion that there was an abuse of the corporate form. Any conjecture that the Mills harbored some undisclosed intent to gain a labor advantage out of that corporate structure far in the future is speculative, subjective, and insufficient to upset the conclusion that the respondents did precisely what the law per-

mitted them to do. In fact, no more has been proved in this case than that. Accordingly, I concur.