**PIPE FITTERS UNION LOCAL NO. 392, Plaintiff,**

**v.**

**AGGRESSIVE PIPING, CORPORATION, et al., Defendants.**

**Civ. A. No. C–1–88–177.**

United States District Court, S.D. Ohio, W.D.

Feb. 11, 1991.

Harold George Korbee, Wood & Lamping, Cincinnati, OH, for plaintiff.

Daniel Patrick Dooley, Frost & Jacobs and Kenneth David Jameson, Roeller, Roeller & Jameson, Cincinnati, OH, for defendants.

### FINDINGS OF FACT, CONCLUSIONS OF LAW, DECISION AND ORDER

SHERMAN, United States Magistrate Judge.

### INTRODUCTION

This action, filed pursuant to § 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185, requires application of the "double-breasted employer" doctrine; that is, the Court must decide whether defendant Quality Mechanicals, Inc. (Quality), a Cincinnati, Ohio non-union pipe fitting business, was the "alter ego" of defendant Aggressive Piping, Inc. (Aggressive), a union pipe fitting company located in the same city. *See, e.g., NLRB v. Fullerton Transfer & Storage Ltd., Inc.,* 910 F.2d 331, 336 n. 7 (6th Cir.1990). At issue are the wage and benefits differentials Quality did not pay eight of its workers on the theory only Aggressive was bound by the collective bargaining agreement with plaintiff, the Cincinnati Pipe Fitters Union.

Trial to the Court was held on September 24–27, 1990. Docs. 40, 42, 46, 49. Having heard the arguments of counsel, and reviewed all relevant evidence, the Court hereby makes its findings of fact and conclusions of law in accordance with Fed.R.Civ.P. 52(a).

### FINDINGS OF FACT

1. This action arises under and jurisdiction is conferred upon the Court pursuant to 29 U.S.C. § 185, § 301 of the Labor Management Relations Act of 1947, as amended ("the Act").

2. Pipe Fitters Union Local No. 392 of Cincinnati, Ohio ("the Union") is, and has been at all material times, a labor organization representing employees in an industry affecting commerce within the meaning of § 2(5) and § 301(a) of the Act.

3. Aggressive and Quality are Ohio corporations engaged as pipe fitting contractors with their principal places of business in Hamilton County, Ohio. Their businesses each affect commerce within the meaning of §§ 2(5)–(7) and § 301 of the Act.

4. From 1953 to 1969, James M. Doll was a member of the Union.

5. In 1969, James M. Doll formed Aggressive with his father-in-law, Silverius Kunz, and another pipe fitter, Mr. Semporott. James M. Doll subsequently became sole shareholder and President of Aggressive.

6. From about 1969, when it was incorporated, to May 31, 1988, Aggressive was a party to successive collective bargaining agreements with the Union. During the pe-

riod 1984 through May 31, 1988, Aggressive was party to a collective bargaining agreement with the Union by virtue of Aggressive's adoption of the terms and conditions of the Master Agreement between the Mechanical Contractors Association and the Union as extended by addendum.

7. In October 1985, members of the Doll family, James M. Doll, Richard Doll, Carolyn Doll, and Denise Doll Albright, all of whom were either officers or employees of Aggressive, decided to form Quality Mechanicals, Inc. James M. Doll gave final approval to form Quality.

8. Quality has never been a party at any time to a collective bargaining agreement with the Union.

9. At its formation, Quality was capitalized with $20,000 transferred from an Aggressive account with Fifth Third Bank to a new account for Quality Mechanicals.

10. The purpose of Quality was to carry on a pipe fitting business including heating, air conditioning, refrigeration, and process piping without the expense of hiring union pipe fitters and paying union wages and benefits.

11. Aggressive was a signatory to the Union contract, which contained a work jurisdiction provision defining the work of pipe fitters as all work in connection with pipe fitting systems; air conditioning or refrigeration systems; industrial processes; piping systems, including fabrication, assembly, erection, installation, dismantling, repairing, reconditioning, adjusting, altering, servicing, handling, unloading, distribution and reloading of appurtenances; and equipment relating thereto.

12. James M. Doll was at all relevant times the sole shareholder, Director and President of Aggressive.

13. At the formation of Quality, Carolyn K. Doll, the wife of James M. Doll, was the sole shareholder.

14. From late 1985 through June 1987, James M. Doll's son, Richard Doll, was Vice-president of Aggressive. On October 14, 1986, one year after the formation of Quality, and while Vice-president of Aggressive, Rich-

ard Doll acquired a fifty percent ownership position in Quality. He became a Director of Quality in December 1986.

15. James M. Doll's wife, Carolyn, was Vice-president of Aggressive from October 1976 until she resigned on October 10, 1985 to become President of Quality.

16. Carolyn Doll was the President of Quality from its formation in October 1985 until she was replaced by her son, Richard, in July 1987.

17. Quality's day-to-day operations were regularly conducted and controlled by Aggressive personnel who denoted themselves "consultants." For example, Larry Freese, an Aggressive employee, managed Quality projects, applied for Quality's licenses and permits, and sought and signed contracts for Quality. Denise Doll Albright, an Aggressive employee during the period October 1985 through May 31, 1988, maintained Quality's files and records, took care of Quality's billing and invoicing, signed Quality's checks, and served generally as office manager for Quality. James M. Doll, President, sole shareholder and sole Director of Aggressive, ordered materials for Quality jobs and scheduled the delivery of tools, materials, and equipment to Quality job sites. He also hired and fired Quality employees, and maintained the day-to-day telephone contact between the Quality office and the Quality foreman in the field.

18. There was no "consulting agreement" with Aggressive providing the means or manner of quantifying the charges to Quality for the "consulting" services. Neither Richard Doll, the President of Quality, nor Larry Freese, knew how consultants were compensated. James M. Doll never told Denise Doll Albright and Larry Freese how to keep track of the Aggressive time spent by them on Quality matters, and neither Albright nor Freese kept such time records. The consulting charges were not based on any time records, but, rather, on mere estimates.

19. Quality and Aggressive carried their corporate insurance and medical insurance under one policy.

20. Tools and equipment owned by Aggressive were used on Quality jobs by Quali-

ty employees. Payment for said tools and equipment was inexact at best.

21. The property upon which the Quality shop was located, and seldom used, was owned jointly by James M. and Carolyn Doll. Quality paid rent to Carolyn Doll and the rent was then deposited into the joint personal account of James M. and Carolyn Doll. The amount of the rent was $1,400 per month which approximated the amount jointly owed by James M. and Carolyn Doll in monthly mortgage payments on the property to the Fifth Third Bank.

22. On occasion, Aggressive employees worked on Quality job sites and worked side-by-side with Quality employees. Aggressive employee Richard Dreihaus, for example, worked on Quality jobs at the Celanese Company, Elder High School, Lazarus Department Store, and Sun Chemical. Aggressive employee David Wegman worked on Quality job sites at Monsanto and Cincinnati Bell.

23. While Quality foremen generally ran the work at the Quality job sites, the Quality foremen took their orders from the president of Aggressive, James M. Doll. Quality foreman Jerry Mossman reported continuously from the job sites of Quality to James M. Doll.

24. Larry Freese, a full-time employee and estimator for Aggressive, sent correspondence on behalf of Quality in which he sought work for Quality rather than for Aggressive. In this correspondence, in an effort to obtain work for Quality, Freese cited his experience as a manager and estimator which, in fact, was gained from his working for Aggressive.

25. Quality and Aggressive shared many of the same customers; these included General Electric, Morton–Thiokol, Totes, Western and Southern, WHB & Associates, Sun Chemical, Aristech, Cincinnati Bell, Senco and Fries & Fries.

26. In July 1985, Aggressive lost a large amount of steady profitable work at the General Motors Assembly Division plant in Norwood, Ohio because of the planned closure of the plant.

27. Aggressive was subsequently unable to recoup the lost work by competitive bidding elsewhere.

28. The Doll family then formed Quality, a non-union pipe fitting company, in order to perform work that Aggressive was unable to obtain.

29. At the time Quality was formed, the Doll family was aware of the legal ramifications and risks of operating Quality as an alter ego of Aggressive. Richard Doll admitted, moreover, that at the time Quality was formed, the Doll family consulted with counsel.

### CONCLUSIONS OF LAW

1. A federal district court has jurisdiction to consider whether a company not a signatory to a collective bargaining agreement may be bound by that agreement as the alter ego of the signatory. 29 U.S.C. § 185; *Carpenters Local Union No. 1846 v. Pratt–Farnsworth, Inc.,* 690 F.2d 489, 508–509 (5th Cir.1982). The basic question which must be answered in the analysis of an alter ego operation is whether the two companies are, in substance, one business separated only in form. *Fullerton, supra,* 910 F.2d at 336.

2. To determine if Quality is the alter ego of Aggressive, the Court must review whether the two enterprises had substantially identical management, business purposes, operations, equipment, customers, supervision and ownership. *Id., NLRB v. Allcoast Transfer, Inc.,* 780 F.2d 576, 579 (6th Cir.1986). With respect to common ownership, the Court may consider if both businesses are solely owned by members of the same family, and the nature of that ownership. *Kenmore Contracting Co., Inc.,* 289 NLRB No. 56, slip op. at 5, 1988 WL 213821 (June 24, 1988).

3. Intent on the part of Aggressive to thwart or otherwise violate the collective bargaining agreement need not be shown in order to prove a violation of the Act. *Fullerton,* 910 F.2d at 337; *Allcoast,* 780 F.2d at 581–582. Instead, the Court must balance each of the listed criteria. *Nelson Elec. v. NLRB,* 638 F.2d 965, 968 (6th Cir.1981). All criteria need not be present, however, and no

one factor is controlling as a prerequisite to the establishment of alter ego status. *Allcoast* at 582.

4. Under Art. VIII, § 9(e) of the collective bargaining agreement, Aggressive is liable for the Union's reasonable attorneys' fees if it is found to have breached that agreement.

5. The Union, in negotiating Aggressive's collective bargaining agreement, did not waive its right to object to Quality's alter ego status. *N.L.R.B. v. Challenge–Cook Bros. of Ohio, Inc.,* 843 F.2d 230, 233 (6th Cir.1988).

■ 6. If alter ego status is found, damages are the difference between the wages and benefits paid by Quality and Aggressive to the eight workers here at issue, and all uncollected union dues. *Plumbers and Gas Fitters Local 107 v. Raymond L. Meyer Co., Inc.,* No. C–84–0558 (W.D.Ky. July 15, 1988).

7. Quality is bound by, and has breached, the terms of the collective bargaining agreement entered into between Aggressive and the Union.

### DECISION

■ Based upon the facts and law of this case, this Court finds that Quality is the alter ego of Aggressive. A review of the *Fullerton Transfer* factors follows.

## MANAGEMENT

Aggressive and Quality have substantially identical management. The ultimate manager of both companies was James M. Doll. He was in charge of, and had the ultimate authority over, the day-to-day operations of both companies. Carolyn Doll, President of Quality for nearly the first two years of its formation, was simply a figurehead. She had no familiarity with the business and was not involved in management in any way. Richard Doll, Denise Doll Albright, and Larry Freese were in management positions with Aggressive while at the same time they were in management positions with Quality. In fact, these managers worked interchangeably for both companies. Quality had its own field supervisors separate from Aggressive, but they reported to James M. Doll. The alleged consulting agreement between Aggressive and Quality was one of form rather than substance.

## BUSINESS PURPOSE

Aggressive and Quality share a common business purpose. They are both mechanical contractors who employ pipe fitters to do pipe fitting work in the areas of process piping, heat ventilating and air conditioning, petro-chemical work, industrial piping and boiler installation and removal. They share the same geographical market. It is true that Quality was used to compete against non-union contractors in a so-called non-union market. But the distinction between a non-union market and a union market is a blurred one, and many jobs are apparently bid by both union and non-union contractors. Looking at all the evidence, this Court finds that the business purpose of both companies was essentially the same.

## OPERATIONS AND EQUIPMENT

Aggressive's and Quality's operations and equipment were interrelated and substantially similar. Quality employees used Aggressive's shop on a regular basis.[1] Quality employees fabricated materials for Quality projects at Aggressive's shop. Quality employees used Aggressive's tools. Aggressive employees would deliver the tools and materials to Quality projects. Materials for Quality projects were shipped to Aggressive. Quality used Aggressive's accounts to order material and obtain credit. General corporate insurance for Quality and Aggressive were underwritten under the same accounts. Health insurance for Quality and Aggressive were also underwritten under the same accounts. Quality leased its shop from Carolyn and James M. Doll. Aggressive employee, Larry Freese, obtained welding certificates and licenses for Quality. Quality kept its active files at Aggressive's shop.

Defendants claim that the two companies lack similarity of operations and equipment because Quality paid for everything it re-

---

1. Quality used its shop so infrequently that usually no one was present to admit the Cincinnati Gas & Electric Co. meter reader.

ceived from Aggressive. But Quality's rental of Aggressive equipment and tools was not an arms-length transaction and was more an accounting formality than an actual payment. For purposes of alter ego analysis, operations and equipment of the two companies were substantially similar.

## CUSTOMERS

Quality and Aggressive shared many of the same customers.[2]

## SUPERVISION AND OWNERSHIP

The supervision and ownership of these two companies are essentially the same. James M. Doll, Richard Doll, Denise Doll Albright, and Larry Freese managed both companies. James M. Doll was the ultimate manager for both companies.

The same family owns Quality and Aggressive. James M. Doll is the sole shareholder of Aggressive. Carolyn Doll, James Doll's wife, owns a half-interest in Quality. Richard Doll, James and Carolyn Doll's son, owns the other half-interest in Quality. Richard Doll owned half of Quality while still Vice-president of Aggressive. Also, Aggressive provided the money to capitalize Quality. Both companies are owned and controlled by the Doll family with ultimate control in the person of James M. Doll.

## CONTINUITY OF WORK FORCE

There is some continuity of work force between the two companies. James M. Doll, Richard Doll, Denise Doll Albright and Larry Freese all performed numerous job duties for Quality while still employees of Aggressive. Aggressive employee Richard Dreihaus worked with Quality employee Rusty Coy at several job sites. Dreihaus also worked with Quality employees, Jerry Mossman and Ray Fisher. Aggressive's employee, Gilbert Steele, delivered tools and materials at James M. Doll's direction to many Quality projects.

## EMPLOYER INTENT

The Doll family, and more specifically, James M. Doll, formed Quality to enable the family to compete in a job market that was becoming more difficult for a union shop. There was no anti-union animus involved in their decision. Notwithstanding, based on a view of all factors, Quality is the alter ego of Aggressive.

## *ORDER*

Upon the above Findings of Fact, Conclusions of Law, and Decision, the Court ORDERS the following:

1. Judgment is hereby entered against Defendants Aggressive and Quality jointly and severally, in favor of plaintiff, in the sum of $319,036.92, which represents unpaid wages, fringe benefit payments, and Union dues owed under the collective bargaining agreement.

2. Judgment is hereby entered against Defendants Aggressive and Quality, jointly and severally, for liquidated damages at the rate of eight percent (8%) on the unpaid fringe benefit contributions owed under the collective bargaining agreement.

3. Judgment is hereby entered against Aggressive and Quality, jointly and severally, for the Union's reasonable legal fees and costs in pursuing this action.

The Union may submit its application for a determination of legal fees and costs to the Court within thirty (30) days of the date of this decision.

**IT IS SO ORDERED.**