**BOILERMAKER–BLACKSMITH NATIONAL PENSION FUND, et al., Plaintiffs,**

**v.**

**Theodore G. GENDRON, et al., Defendants.**

**No. Civ.A. 98–2317–KHV.**

United States District Court, D. Kansas.

April 27, 2000.

 See, also, 67 F. Supp.2d 1250.

G. Gordon Atcheson, Charles R. Schwartz, Curtis, G. Barnhill, Blake & Uhlig, P.A., Kansas City, KS, Mark A. Kistler, Yonke, Arnold, Newbold & Regan, P.C., Kansas City, MO, for Plaintiffs.

William S. Robbins, Jr., Watkins, Boulware, Lucas, Miner, Murphy & Taylor, LLP, Kansas City, MO, Dan C. Sanders, Aaron J. Racine, Gepford, Monaco & Sanders L.C., Kansas City, MO, for Defendants.

### MEMORANDUM AND ORDER

VRATIL, District Judge.

Plaintiffs bring suit under Sections 502 and 515 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1132 and 1145, to collect fringe benefit contributions allegedly due and owing from defendants. This matter comes before the Court on the following motions: *Defendant Sandra Gendron's Motion To Dismiss, Or, In The Alternative, Motion For Summary Judgment* (Doc. # 83) and *Plaintiffs' Motion For Summary Judgment* (Doc. # 86), both filed February 28, 2000, and *Defendants Theodore G. Gendron, Jon–Michael Gendron, And Northeast Service And Inspections, Inc. [sic] Motion For Summary Judgment Or, In The Alternative, For Partial Summary Judgment* (Doc. # 94) filed March 7, 2000. For reasons set forth below, the Court finds that each motion should be overruled.

Plaintiffs are multi-employer benefit plans and fiduciaries under ERISA. They provide pension and health insurance coverage and benefits to employees whose employers are bound to collective bargaining agreements with the International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers, AFL—CIO ("the union"). Plaintiffs assert claims against Tank Maintenance & Technology, Inc. ("Tank Maintenance"), Northeast Service & Inspections, Inc. ("Northeast Services"), J.M.G., Inc., Theodore Gendron ("Gendron"), Sandra Gendron ("Sandra") and Jon–Michael Gendron ("Jon–Michael").[1] In Count I, they claim that five defendants—Northeast Services, J.M.G., Inc., Gendron, Sandra and Jon–Michael—are liable on a $223,219.02 judgment for unpaid benefit contributions from September 1993 through September 1996, as alter egos of Tank Maintenance. In Count II, plaintiffs seek unpaid benefits for October 1996 to the present from Tank Maintenance. They claim that Northeast Services, J.M.G., Inc., Gendron, Sandra and Jon–Michael are liable for such contributions as alter egos of Tank Maintenance. As to both counts, plaintiffs contend that Gendron, Sandra and Jon–Michael are liable as alter egos of Northeast Services.

In their motion for summary judgment, plaintiffs assert that the record conclusively establishes that Northeast Services is the alter ego of Tank Maintenance and that Gendron, Sandra and Jon–Michael are alter egos of both Tank Maintenance and Northeast Services. Plaintiffs further contend that collateral estoppel precludes defendants from re-litigating the amount of judgment which plaintiffs have obtained against Tank Maintenance for the time period from September 1993 to September 1996, and that defendants' failure to keep adequate records entitles plaintiffs to a conclusive presumption that defendants owe benefit contributions for all of Northeast Services payroll hours in 1997 and 1998. Defendants contend that the undisputed evidence establishes that they are

**1.** On February 25, the Clerk filed an *Entry of* *Default* (Doc. # 82) against J.M.G., Inc.

not alter egos of either Tank Maintenance or Northeast Services. In addition, Sandra asserts that the Court lacks subject matter and personal jurisdiction over plaintiffs' claims against her.

## Summary Judgment Standard

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Vitkus v. Beatrice Co.*, 11 F.3d 1535, 1538–39 (10th Cir.1993). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. A "genuine" factual dispute requires more than a mere scintilla of evidence. *Id.* at 252, 106 S.Ct. 2505.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Hicks v. City of Watonga*, 942 F.2d 737, 743 (10th Cir.1991). Once the moving party meets its burden, the burden shifts to the non-moving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l, Inc. v. First Affiliated Secs., Inc.*, 912 F.2d 1238, 1241 (10th Cir.1990); *see also*

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir.1991). The nonmoving party may not rest on its pleadings but must set forth specific facts. *Applied Genetics*, 912 F.2d at 1241.

"[W]e must view the record in a light most favorable to the parties opposing the motion for summary judgment." *Deepwater Investments, Ltd. v. Jackson Hole Ski Corp.*, 938 F.2d 1105, 1110 (10th Cir.1991). Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative. *Anderson*, 477 U.S. at 250–51, 106 S.Ct. 2505. "In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir.1988). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52, 106 S.Ct. 2505.

## Facts

The following facts are either undisputed or, where disputed, set forth according to each party's contentions.[2]

Plaintiffs administer collective bargaining agreements between the Boilermakers

---

**2.** Plaintiffs rely on numerous exhibits which they do not identify or authenticate, including Exhibits 18, 19, 20, 21, 22, 23, 24, 25, 26, 28, 29, 30, 31, 32, 41 and 42. These exhibits are not competent evidence because they are not identified, sworn or certified. Rule 56(e) provides, in pertinent part:

Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith.

For purposes of summary judgment, each document must be authenticated by and attached to an affidavit which meets the requirements of Rule 56(e). 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2722 (1998) at 382–84. *See, e.g., Nolla Morell v. Riefkohl*, 651 F.Supp. 134, 140 (D.Puerto Rico 1986) (documents filed by defendants on motion for summary judgment inadmissible where unaccompanied by affidavits attesting to validity of documents); *Cummings v. Roberts*, 628 F.2d 1065, 1068 (8th Cir.1980) (on motion for summary judgment, district court properly did not consider 17 pages of medical records that were attached to affidavit but not certified as required by Federal Rule of Civil

union and signatory employers. Under ERISA, each plaintiff is an "employee benefit plan" as defined in 29 U.S.C. § 1002(3) and a "multi-employer plan" within the meaning of 29 U.S.C. § 1002(37); also, each plaintiff has been established pursuant to Section 302(c)(5) of the Labor Management Relations Act, 29 U.S.C. § 186(c)(5). The collective bargaining agreements require signatory employers to provide plaintiffs monthly reports and payments based upon the number of hours worked by their employees. Reports and contributions for each month are due on the 15th day of the following month. Late payments are subject to a one-time 12 per cent liquidated damage assessment and unpaid balances accrue interest at the rate of 12 per cent per annum.

In 1992, Gendron incorporated Tank Maintenance, a New Jersey corporation with its principal place of business in New Jersey. Tank Maintenance performed general welding work, including welding on steel tanks, tank repair and pipe work. When he started Tank Maintenance, Gendron personally owned some of its equipment. Tank Maintenance did not pay Gendron for the use of his equipment. Gendron also loaned personal funds to the company and managed its day-to-day business. His brother Jon–Michael served as the Tank Maintenance president. Jon–Michael's authority was equal to or greater than his brother's. Jon–Michael was authorized to execute collective bargaining agreements, execute mechanics lien wavers for tank projects and seek to represent Tank Maintenance in this Court. Generally, Gendron was in charge of tank work and Jon–Michael was responsible for pipe work.[3]

Defendants maintain that Wallace Ford acted as vice president of Tank Maintenance. According to defendants, Ford managed the daily affairs of Tank Maintenance and, with Gendron, made all major decisions. According to Jon–Michael, however, he, Gendron and Sandra (Gendron's wife) ran Tank Maintenance. Tank Maintenance did not keep corporate records which identified its corporate officers. Jon–Michael believed that Sandra was the vice president and secretary. He was "almost positive" that she maintained the corporate records, though he never asked her to do so.

Defendants have no records of any corporate meetings of Tank Maintenance, and the parties do not agree on who owned its stock. Defendants contend that Sandra, Jon–Michael, Ford, Mark Heslin and Joseph Lucas were shareholders until July 7, 1997, when they tendered their shares to Tank Maintenance and Gendron became sole shareholder. Plaintiffs assert that Tank Maintenance never had shareholders. Plaintiffs cite Gendron's deposition testimony that he had no idea who owned the Tank Maintenance stock and that he would have to look for that information in corporate minutes from the annual meeting.

**Union Agreements**

In August 1993, Tank Maintenance employees were on a Kerr–McGee job site to repair an above ground storage tank. Because Tank Maintenance was not party to a union contract, the union erected a picket line.[4] Therefore, on August 13, 1993, Gendron spoke with George Santos ("Santos"), a union representative, about getting a job compliance agreement for the Kerr–McGee project. A job compliance agreement covers one job and allows work by non-union contractors who agree to post bond and pay wages and fringe benefits under the Articles of Agreement Covering Tank Repair and Related Work ("Tank Repair Agreement").[5] Santos faxed Gen-

---

Procedure 56(e)). Accordingly, the Court does not consider these exhibits in its ruling. *See Jarrett v. Sprint/United Management Co.,* 37 F.Supp.2d 1283, 1285 n. 2 (D.Kan.1999); *Denmon v. Runyon,* Case No. 92–2144–EEO, 1993 WL 441970, *3 (D.Kan. Oct. 25, 1993).

3. Plaintiffs maintain that Jon–Michael was also involved with tank work but the parties dispute the extent of any such involvement.

4. Plaintiffs deny knowledge of any picket line.

5. Covered work under the Tank Repair Agreement is "limited to cleaning, repairing, demo-

dron an excerpt from an agreement which reflected a $20,000 bond requirement and contained a copy of an escrow agreement that referred to a job compliance understanding.[6]

On August 16, 1993, Santos sent Gendron a letter which, according to Santos, would "enable [Tank Maintenance] to do the project for Kerr–McGee." The letter specified the scope of work that Gendron had previously described and provided for bond in the amount of $5,000, the amount which Santos and Gendron had estimated would equal the fringe benefit contributions for the Kerr–McGee job. A signature page was attached to the letter.[7] On or about August 17, 1993, Jon–Michael signed the signature page of the Tank Repair Agreement on behalf of Tank Maintenance. At the time, he believed that it was a job compliance agreement which would bind Tank Maintenance on only the Kerr–McGee project. The signature page provided in part as follows:

> The signature [sic] affixed hereto are signatures to the Tank Repair and Related Work Agreement in effect from November 1, 1991 through October 31, 1994, and thereafter for successive one (1) year periods until amended or terminated by either party by giving to the other party notice of such termination at least sixty (60) days prior to its anniversary date. . . .

It contained no language which suggested that it applied to any one job.

On the day he signed the signature page, Jon–Michael signed a separate agreement which obligated Tank Maintenance to establish a $5,000 escrow account. Unlike the signature page to the Tank Repair Agreement, the escrow agreement specifically referred to a job compliance agreement.

The parties dispute whether Tank Maintenance had a copy of the Tank Repair Agreement when Jon–Michael signed the signature page. Article 2, Section 2 of the Tank Repair Agreement provides that "[u]pon special request, the scope of work of Section 1 and any other Articles of this agreement may be altered by mutual agreement of the N.T.D. Representative and Contractor." Santos previously had entered into numerous job compliance agreements that bound the contractor to the Tank Repair Agreement for only one job.

After Jon–Michael signed the signature page, Gendron learned that the union considered Tank Maintenance to be a signatory contractor to the Tank Repair Agreement and not merely a single job compliance agreement. When he made this discovery, Gendron spoke with Santos—who told him not to worry because Tank Maintenance was not doing enough work to take work away from other signatory contractors. Santos told Gendron that he would not complain as long as signatory contractors did not complain. Based on this conversation, Gendron un-

---

lition, renovation, dismantling and re-erection of existing tankage." In addition, covered work includes "repairs to and replacement of tank bottoms, roofs, structure, shell rings and top angle." The agreement does not cover work related to building a "complete new tank" or related to piping outside an existing tank, except to the extent that such work involves "tank appurtenances similar but not limited to the following items: nozzles, man ways, clean out doors, sumps, special fill and outlet devices, water draw off assemblies, gauges, vents, seals, roof drains, stairs and ladders." The Tank Repair Agreement is one of several standard collective bargaining agreements which the Boilermakers negotiate and enforce. It is a standard agreement, in

that its terms do not vary from one signatory employer to another. The agreement requires signatory employers to make payments for each hour worked by covered employees.

6. The record is unclear why the agreement contained a $20,000 bond requirement. The parties agree that the minimum bond requirement was raised from $5,000 to $20,000 under the second Tank Repair Agreement which Jon–Michael signed in February 1995.

7. The signature page was entitled "Tank Repair and Related Work Agreement" but in fact it is only a signature page and does not purport to embody an agreement which is independent of the Tank Repair Agreement.

derstood that the union would require Tank Maintenance to comply with the Tank Repair Agreement only on jobs on which it bid against other signatory contractors. Based on this understanding, Tank Maintenance did not believe it was necessary to withdraw from the Tank Repair Agreement.[8]

In late 1993, Tank Maintenance finished work on the Kerr–McGee project. Tank Maintenance owed nearly $6,000.00 in fringe benefit contributions on the job. In October 1993, Tank Maintenance submitted reports for August and September, along with checks totaling $3,169.80. Initially, Tank Maintenance did not pay fringe benefit contributions for some work performed by union referrals because Gendron believed that their work had been defective.[9] In February, May and August of 1994, plaintiffs requested information from Tank Maintenance about individuals who had worked at the Kerr–McGee job.[10]

In February 1995, Jon–Michael, as president of Tank Maintenance, signed the signature page of a new Tank Repair Agreement. The second signature page provided in part:

> The signature [sic] affixed hereto are signatures to the Tank Repair and Related Work Agreement in effect from November 1, 1994 through October 31, 1997, and thereafter for successive one (1) year periods until amended or terminated by either party by giving to the other party notice of such termination at least sixty (60) days prior to its anniversary date....

The union faxed the new signature page to Tank Maintenance without explanation. Jon–Michael believed that the document would continue the arrangement whereby the union would bind Tank Maintenance to the Tank Repair Agreement only when it bid against signatory union contractors. Gendron told Jon–Michael that the union continued to hold funds that Tank Maintenance had placed in escrow at the time of the first agreement. Gendron and Jon–Michael decided that Tank Maintenance would use the union services again and that continuing the agreement would eliminate the need to put the money into escrow again. At the time he signed the second signature page, the Tank Repair Agreement had been modified to increase the minimum escrow bond from $5,000 to $20,000. Plaintiffs did not ask Tank Maintenance to increase the bond, however, to the amount required by the second agreement.

In late April 1995, plaintiffs formally demanded that Tank Maintenance pay delinquent contributions in the amount of $2,853. Although Gendron believed that union referrals had sabotaged the job, he ultimately approved payment of their benefit contributions.

On August 30, 1996, Jon–Michael sent the union a letter which stated that Tank Maintenance intended to withdraw from the Tank Repair Agreement. Because the Tank Repair Agreement was in effect "through October 31, 1997, and thereafter for successive one (1) year periods until amended or terminated by either party," plaintiffs maintain that Tank Maintenance could not effectively withdraw from the agreement before October 31, 1997.

---

8. The oral agreement between Gendron and Santos was not reduced to writing. Plaintiffs do not dispute defendants' contention that Tank Maintenance orally agreed to be bound by the Tank Repair Agreement only when it bid against union contractors. Instead, plaintiffs argue that any alleged oral understandings are unenforceable and immaterial.

9. Tank Maintenance had to return to the job site and re-do the work with its own employees.

10. Plaintiffs dispute whether these requests were limited to the Kerr–McGee job. Defendants maintain that union representatives were aware that Tank Maintenance was involved in other tank repair jobs for which it did not make fringe benefit contributions, but that plaintiffs did not request contributions for these jobs.

## Prior Lawsuit—*Tank Maintenance I*

On April 4, 1996, plaintiffs sued Tank Maintenance in the United States District Court for the District of Kansas, Case No. 96–2161–JWL (*"Tank Maintenance I"*). The original complaint sought $2,853 in delinquent fringe benefit contributions for August through December 1993. During the litigation, plaintiffs audited the Tank Maintenance books and revised their claim to include all hours worked by Tank Maintenance employees, regardless whether the work was covered by the Tank Repair Agreement, since Tank Maintenance had allegedly failed to keep adequate records to delineate covered and non-covered work. Counsel represented Tank Maintenance until after the close of discovery. On January 10, 1997, counsel for Tank Maintenance filed a motion to withdraw which the Court granted on February 11, 1997. On April 30, 1997, plaintiffs filed a motion for summary judgment which they supported with affidavits and exhibits, including an affidavit and audit report in which accountants calculated delinquent principal, liquidated damages and interest.

On July 21, 1997, the Court entered summary judgment against Tank Maintenance for fringe benefit contributions for September 1, 1993 through September 30, 1996. In doing so it noted that counsel for Tank Maintenance had withdrawn and that Tank Maintenance, as a corporation, could not represent itself pro se. The Court therefore refused to let Jon–Michael file a pro se brief in opposition to plaintiffs' motion for summary judgment and sustained plaintiffs' motion as uncontested. On September 22, 1997, the Court entered a *nunc pro tunc* order for judgment in the amount of $223,219.02, which corresponded to the evidence submitted in support of plaintiffs' motion for summary judgment.

### Northeast Services

In the fall of 1996, during the course of the *Tank Maintenance I* litigation, the relationship between Jon–Michael and Gendron became strained. Jon–Michael was frustrated because plaintiffs claimed that the Tank Repair Agreement covered more than the Kerr McGee project and also sought contributions for all hours worked by Tank Maintenance employees— even on work outside the scope of the Tank Repair Agreement. Jon–Michael blamed his brother for "big mistakes" because Gendron had not been present when he had signed the signature page of the Tank Repair Agreement. Things came to a head when Tank Maintenance attorneys told Gendron and Jon–Michael that they had to let plaintiffs audit the books. Jon–Michael did not want auditors to look at the books and he was upset because Gendron was going to let them in. Jon–Michael told Gendron: "When the snakes come in here and do an audit, they're going to take every hour that every man worked regardless whether it was listed as covered work or not, and we're going to have to pay for it. . . . I am not going to be responsible to pay for hours to the union for doing pipe work."

As a result of this argument, Jon–Michael decided to form a new corporation, Northeast Services, to perform non-covered work. In late September 1996, five months after plaintiffs filed *Tank Maintenance I,* Jon–Michael began taking steps to incorporate Northeast Services. On October 31, 1996, the incorporating service executed a certificate of incorporation for Northeast Services.[11] Defendants claim that Jon–Michael did not form Northeast Services to avoid the past obligations of Tank Maintenance under the Tank Repair Agreements; rather, they claim that from that point forward he wanted to perform non-covered work without fear that plaintiffs would claim payments under the Tank Repair Agreement.

---

11. Jon–Michael first incorporated the company under the name Northeast Services, Inc. He later learned that the State of New Jersey had previously given the same name to another company. On September 15, 1997, he changed the name of the company to Northeast Service & Inspections, Inc.

Jon–Michael initially operated Northeast Services out of his mother's home, where he also lived. This arrangement lasted somewhere between two weeks and two months. On December 18, Northeast Services applied for a federal identification number, listing its business address as 2122 Branch Pike, Cinnaminson, New Jersey—the same address as Tank Maintenance. Northeast Services paid rent to Jon–Michael, who owned the property. When Northeast Services began using the property, it occupied the bottom floor in space previously occupied by Tank Maintenance. Tank Maintenance continued to pay the same rent to Jon–Michael (until it stopped paying rent when it ran out of money), but its space was then limited to one upstairs office for Gendron. At some point, Northeast Services began paying rent to J.M.G., Inc., which was Jon–Michael's "personal company."[12] In July 1998, Northeast Services moved to a new business location. For several months, however, it continued to pay full rent to use the basement at 2122 Branch Pike for storage.

Jon–Michael funded the start-up operations of Northeast Services with funds he obtained from constructing an interior lube oil terminal at Philadelphia Wholesale Distributors. The parties dispute whether this work would have been covered by the Tank Repair Agreement. Jon–Michael and Joseph Lucas performed the work. They had worked together at many companies, including Tank Maintenance. The parties dispute whether Lucas was employed by and receiving payroll checks from Tank Maintenance at the time he performed the work at Philadelphia Wholesale Distributors.

At the beginning of Northeast Services, Jon–Michael's work required only a small pickup truck and small welding machines. Beginning in the first days of 1997, however, Tank Maintenance began to sell its equipment to Northeast Services. By March 5, 1997, Tank Maintenance owned no equipment except two trucks which did not run. Gendron owned the Tank Maintenance office equipment, including desks, computers, and fax and copying machines. The record does not clearly reveal how much equipment was sold. Gendron testified that Tank Maintenance sold about $60,000 worth of equipment to raise money to fight the union, but he did not specify the identity of the buyers. The record contains no evidence that Tank Maintenance sold equipment to anyone other than Northeast Services. According to Jon–Michael, Northeast Services probably required several months to work enough jobs to come up with the money to buy the equipment. Jon–Michael is not sure whether he and Gendron agreed on a price for the equipment. Ultimately, however, they agreed that Northeast Services would pay what Tank Maintenance had initially paid for the equipment.

Initially, no invoices recorded the purchases by Northeast Services of Tank Maintenance equipment. Bonnie Wollyung, bookkeeper for both Tank Maintenance and Northeast Services, recorded the payments as loans by Northeast Services to Tank Maintenance.[13] At the end of 1997 or beginning of 1998, Wollyung prepared invoices which reflected the purchase of the equipment.[14] She did so be-

---

12. Jon–Michael was the sole officer of J.M.G., Inc., which did not have any employees or directors. Plaintiffs contend that the only business purpose of J.M.G. was to operate hockey camps and hockey instructional clinics, although defendants maintain that it also engaged in the business of property management.

13. The record is unclear whether, at the time, Wollyung was bookkeeper for Tank Maintenance or Northeast Services, or both. From February 1993 until January or February 1997, she worked as bookkeeper for Tank Maintenance. When she worked for Northeast Services, she worked in the very office she had occupied at Tank Maintenance.

14. The dates on the invoices are from December 1996 to February 1997. Wollyung testified in her deposition, however, that she prepared the invoices at the end of 1997 or beginning of 1998.

cause an accountant had told her that he needed backup for the transactions, *i.e.* something more than just money going from Northeast Services to Tank Maintenance. Wollyung and Jon–Michael there-fore sat down and tried to figure out what equipment Northeast Services had purchased, and then listed the equipment to correspond to payments which Northeast Services had made.

During the months after the incorporation of Northeast Services, Gendron continued to bid on work for Tank Maintenance, coordinate completion of ongoing projects, and collect money and resolve business tax issues for Tank Maintenance. During these months, Tank Maintenance had about 20 employees. Gendron testified that while he continues to keep the corporate charter, Tank Maintenance had shut down operations by March 5, 1997.

Northeast Services performed covered tank work for Tank Maintenance on a job for Shipley Oil.[15] Tank Maintenance had been negotiating for the contract for almost a year, and defendants maintain that Tank Maintenance entered into an oral subcontract with Northeast Services to perform the work. Gendron had offered to subcontract the job to other companies but their prices were higher than those of Northeast Services. Northeast Services did not perform all of the work under the contract. Tank Maintenance subcontract-ed the concrete work to Carpino Contract-ing and other work to R & V Painting. Project manager Vincent J. Gangemi, who had worked for both Tank Maintenance and Northeast Services, prepared the job summary.[16] Shipley Oil paid Tank Maintenance for the job, and Tank Maintenance paid Northeast Services for work which it had performed under the subcontract.

On March 10, 1997, Gendron submitted a tank job proposal to Duck Island Terminal on Northeast Services letterhead. The proposal stated: "Northeast Services Inc. is pleased to offer our proposal. . . ." Gen-

dron was not then employed by Northeast Services and he is not sure whether the job, which he received, was a Tank Maintenance or a Northeast Services job. Tank Maintenance could not perform the job since by this time it had no employees and little equipment. Gendron testified that he discussed it with Jon–Michael, who probably told him to handle it if he wished. The job involved tank work which was covered by the Tank Repair Agreement. Northeast Services received the money for the job.

When Northeast Services moved its offices, telephone calls to the old Tank Maintenance line (609–786–8484) were forwarded to Gendron's office at the new Northeast Services location. Gendron testified that he answered the line "Tank Maintenance" and that he disconnected the line on the advice of his attorney. The telephone number for Northeast Services is 609–989–0196. Tank Maintenance previously used this number. Northeast Services paid to install the phone line (609–989–0196) at the Duck Island facility for "employees" who were working there, but Gendron could not specify whether the "employees" were employees of Tank Maintenance or Northeast Services. The number was not given out to customers or third parties. Northeast Services later moved its office to the Duck Island facility and assumed the Duck Island phone number as its main number. It then gave out the number to Northeast Services customers and third parties.

In approximately December 1997, Northeast Services purchased Precision Tank, Inc., a company that was primarily engaged in repairing and erecting above ground storage tanks. Precision Tank was not a signatory to any Boilermakers agreement. Northeast Services purchased the company in order to increase the amount of tank work it could perform. In purchasing the company, Northeast Services

---

**15.** The record is unclear as to when this work was performed.

**16.** From the record it is not clear which company employed Gangemi at the time he prepared the job summary.

obtained Precision Tank's equipment, receivables, an ongoing contract and access to a customer base. Northeast Services hired the Precision Tank employees to perform tank work. These employees had never been employed by Tank Maintenance.

Defendants contend that Gendron started to work for Northeast Services in 1997 or 1998, after he made amends with Jon–Michael.[17] Plaintiffs contend that Gendron and Jon–Michael never stopped working together. Gendron in fact testified that although their "brother-to-brother" relationship was "strained a little bit," it would not be accurate to say that he and Jon–Michael were not working together during that time. Gendron stated that during this time, he did not ask his brother a lot of questions, but they did talk about money matters. The parties dispute whether Gendron tried to find other work before he went to work at Northeast Services.

The parties dispute when Northeast Services first began doing tank work and how much of its total business consisted of tank work. Jon–Michael is the president of Northeast Services. He spends most of his time in the office. He and Gendron share equal supervisory authority over employees. Jon–Michael handles the pipe work and Gendron handles the tank work. Defendants maintain that Jon–Michael is the sole shareholder of Northeast Services. Pointing to Jon–Michael's testimony that he is "not sure" if he is a shareholder and to evidence that the company stock certificates are still blank and have not been issued, plaintiffs assert that Northeast Services has never had shareholders. Defendants maintain that Lucas is vice president of Northeast Services. Plaintiffs disagree, pointing to Jon–Michael's testimony that he is the only corporate officer. Aside from job folders, Tank Maintenance and Northeast Services maintain no records that reflect whether work which they performed was covered by the Tank Repair Agreement. The job folders identify the persons on the job and the hours worked, but they do not specify whether the persons performed tank work or pipe work. The parties dispute whether job folders sufficiently describe the work performed, so as to permit covered work to be distinguished from non-covered work.

**Personal Involvement by Theodore Gendron, Sandra Gendron and Jon–Michael Gendron**

For certain periods since 1993, Tank Maintenance has paid Gendron's salary through his wife, *i.e.* Tank Maintenance included his salary in Sandra's paycheck so that Gendron could avoid an IRS levy on his wages. As a result, the vast majority of Sandra's "salary" consisted of Gendron's wages. The same salary arrangement is in place at Northeast Services. The total wages which Tank Maintenance paid Sandra did not exceed the amount which she and her husband would have been entitled to receive, however, in separate payroll checks.

Plaintiffs maintain that the individual defendants received additional compensation from Tank Maintenance and Northeast Services through payment of personal expenses, including home mortgage and credit card bills. Defendants maintain that these payments constitute reimbursement for business expenses. According to defendants, Gendron and Jon–Michael incurred out of pocket business expenses that they did not charge to Tank Maintenance and Northeast Services. In return, the businesses paid their personal bills and expenses. They did not document how much they paid for business expenses or how much they received in payment of personal bills and expenses. Instead, Gendron kept a rough estimate in his head.

Gendron and Sandra have not deducted unreimbursed employee expenses on their tax returns. While Gendron and Sandra have deducted home mortgage interest on their personal tax returns, Tank Mainte-

---

17. Defendants do not specify when during this two-year period Gendron and Jon–Mi-

chael made amends or when Gendron began working for Northeast Services.

nance and Northeast Services have regularly made the mortgage payments. Both the house and mortgage are in Sandra's name.

Gendron has a personal credit card with Capital One. He applied for the card in July 1997, listing Tank Maintenance as his employer. Jon–Michael signed a check for $100 from the Northeast Services account for the deposit on the card. Gendron testified that he reimbursed Northeast Services with $100 cash to cover the check, although no records document this transaction. Gendron made personal and business expenses on this and another credit card. Northeast Services paid the credit card bills until a few months before Gendron's deposition, when he and Sandra began making the payments.

Sandra owns a Lincoln Continental which she has provided to a Northeast Services employee for use as a company and personal vehicle in lieu of a pay raise. Sandra and Gendron make payments for the car and insurance.

### Sandra Gendron

Sandra is a citizen and resident of the State of New Jersey. She has never resided in the State of Kansas, and she has not personally transacted business here. Sandra maintains that she was never an officer of Tank Maintenance and that she did not participate directly or indirectly in the its management. Plaintiffs dispute both assertions. Jon–Michael testified to his belief that Sandra was vice president and secretary of Tank Maintenance and that she had been involved in running the business since its inception. Sandra has never been an officer, director or shareholder in Northeast Services.

Sandra worked for Tank Maintenance and Northeast Services. It is unclear when she began working for Northeast Services and whether she worked full time or part time for either company. She did not work a regular five day schedule. Her duties at Tank Maintenance included setting up trade shows, purchasing materials, preparing brochures and entertaining clients and their wives. Plaintiffs maintain

that she also was in charge of sales. Her duties at Northeast Services are similar to those which she performed at Tank Maintenance. Sandra did not participate directly or indirectly in the negotiation of the Tank Repair Agreements, and she was not involved in the incorporation of Northeast Services.

### Analysis

### 1. Jurisdiction Over Claims Against Sandra Gendron

In Count I of the Second Amended Complaint, plaintiffs allege that Sandra, Gendron and Jon–Michael are the alter-egos of Tank Maintenance and that they are therefore liable for the fringe benefit contributions which Tank Maintenance owed for September 1993 through September 1996. Because this time period is covered by plaintiffs' judgment in *Tank Maintenance I*, Sandra asserts that Count I is merely an attempt to collect that judgment and that under *Peacock v. Thomas*, 516 U.S. 349, 116 S.Ct. 862, 133 L.Ed.2d 817 (1996) the Court lacks subject matter jurisdiction over plaintiffs' claim. Sandra also asks that the Court dismiss plaintiffs' claims for lack of personal jurisdiction.

### A. Subject Matter Jurisdiction

■ Federal courts are courts of limited jurisdiction and may only exercise jurisdiction when specifically authorized to do so. *Castaneda v. I.N.S.*, 23 F.3d 1576, 1580 (10th Cir.1994). A court lacking jurisdiction must dismiss the cause at any stage of the proceeding in which it becomes apparent that jurisdiction is lacking. *Scheideman v. Shawnee County Bd. of County Comm'rs*, 895 F.Supp. 279, 280 (D.Kan. 1995) (citing *Basso v. Utah Power and Light Co.*, 495 F.2d 906, 909 (10th Cir. 1974); Fed.R.Civ.P. 12(h)(3)). The party who seeks to invoke federal jurisdiction bears the burden of establishing that such jurisdiction is proper. *Basso*, 495 F.2d at 909. When federal jurisdiction is challenged, plaintiffs bear the burden of showing why the case should not be dismissed.

*Jensen v. Johnson County Youth Baseball,* 838 F.Supp. 1437, 1439–40 (D.Kan.1993).

■ In *Peacock,* the Supreme Court found that the district court lacked subject matter jurisdiction for a second law suit in which plaintiff sought to pierce the corporate veil to hold an alter ego liable for a judgment against a corporation for failure to pay ERISA contributions. *See* 516 U.S. at 354, 116 S.Ct. 862. Plaintiff had sued the individual defendant as an alleged alter ego in the first law suit. The trial court, however, ruled that the individual defendant was not liable as an alter ego of the corporation. In the second suit, plaintiff alleged that the individual defendant had performed *post*-judgment acts which warranted a piercing of the corporate veil for purposes of collecting the judgment from the first suit. The Supreme Court stated that "[e]ven if ERISA permits a plaintiff to pierce the corporate veil to reach a defendant not otherwise subject to suit under ERISA, [plaintiff] could invoke the jurisdiction of the federal courts only by independently alleging a violation of an ERISA provision or term of the plan." *Peacock,* 516 U.S. at 354, 116 S.Ct. 862.

In its earlier ruling, this Court found that Count I was not an attempt to collect the prior judgment in *Tank Maintenance I. See Boilermaker–Blacksmith Nat'l Pension Fund v. Gendron,* 67 F.Supp.2d 1250 (D.Kan.1999). Rather, Count I is framed as an action under Sections 502 and 515 of ERISA, seeking to hold defendants liable as alter egos for contribution obligations that they allegedly incurred while operating as Tank Maintenance, Northeast Services and under other aliases. Further, the Court found that *Peacock* should be read narrowly, as simply holding that ERISA does not provide independent subject matter jurisdiction for "imposing liability for an extant ERISA judgment against a third party." 516 U.S. at 353, 116 S.Ct. 862. This Court found that it has subject matter jurisdiction over the alter ego claims, citing *Greater Kansas City Laborers Pension Fund v. Superior Gen. Contractors, Inc.,* 104 F.3d 1050 (8th Cir.1997) (finding subject matter jurisdiction over alter ego claims, while noting that under *Peacock* plaintiff may not pierce corporate veil to enforce ERISA judgment against individual not liable for underlying ERISA violation). Plaintiffs assert that under the law of the case, the Court may not reconsider this issue. *See United States v. Alvarez,* 142 F.3d 1243, 1247 (10th Cir.1998) (when court decides rule of law, decision should govern subsequent stages in same case). Defendants have offered no reason to revisit the matter, and the Court declines to reconsider this matter. *See Alvarez,* 142 F.3d at 1247 (listing exceptions to law of case doctrine).[18]

### B. Personal Jurisdiction

Plaintiffs bear the burden of establishing personal jurisdiction. Prior to trial, however, when a motion to dismiss for lack of jurisdiction is decided on the basis of affidavits and other written materials, plaintiffs need only make a prima facie showing. The allegations in the complaint must be taken as true to the extent that they are uncontroverted by defendants' affidavits. If the parties present conflicting affidavits, all factual disputes are resolved in plaintiffs' favor, and plaintiffs' prima facie showing is sufficient notwithstanding the contrary presentation by the moving parties. *Behagen v. Amateur Basketball Ass'n,* 744 F.2d 731, 733 (10th Cir.1984), *cert. denied,* 471 U.S. 1010, 105 S.Ct. 1879, 85 L.Ed.2d 171 (1985); *see also Williams v. Bowman Livestock Equipment Co.,* 927 F.2d 1128, 1130–31 (10th Cir.1991); *Rambo v. American Southern Ins. Co.,* 839 F.2d 1415, 1417 (10th Cir.1988).

Sandra asserts that the Court lacks personal jurisdiction over her. Plaintiffs as-

---

18. The Court further notes that it has original jurisdiction over plaintiffs' claims in Count II. Thus, in any event, 28 U.S.C. § 1367(a) would give the Court supplemental jurisdiction over the claims in Count I.

sert that service was proper under 29 U.S.C. § 1132(e)(2), which provides:

> Where an action under this subchapter is brought in a district court of the United States, it may be brought in the district where the plan is administered, where the breach took place, or where a defendant resides or may be found, and process may be served in any other district where a defendant resides or may be found.

29 U.S.C. § 1132(e); *see Boilermaker-Blacksmith Nat. Pension Fund v. Nevada Boiler Works, Inc.,* No. 96–2168–GTV, 1997 WL 94241 at *4 (D.Kan. Feb.27, 1997) (citing *McCracken v. Automobile Club of Southern California, Inc.,* 891 F.Supp. 559, 561 (D.Kan.1995) (interpreting § 1132(e)(2) as authorizing nationwide service of process)).

Sandra argues that to determine personal jurisdiction, the Court should evaluate her contacts with the forum state, as distinct from her contacts with the United States. *See, e.g., Burkhart v. Medserv Corp.,* 916 F.Supp. 919, 922–923 (W.D.Ark. 1996) (dismissing ERISA claim for lack of personal jurisdiction where defendant lacked minimum contacts with forum state); *Chemtech Indus., Inc. v. Goldman Financial Group, Inc.,* 156 F.R.D. 181, 183–84 (E.D.Mo.1994) (same). She points out that she is a New Jersey resident, and asserts that she has not resided or done business in Kansas. She therefore asserts that she lacks sufficient contacts with the State of Kansas to subject her to the long-arm jurisdiction of this Court.

In ruling on this precise argument, when the other defendants raised it, the Court adopted the approach of *Nevada Boiler Works:*

> In the context of statutes authorizing nationwide service of process, federal courts must focus on the Due Process Clause of the Fifth Amendment. *U.S. Telecom v. Hubert,* 678 F.Supp. 1500, 1506 (D.Kan.1987). Although the Tenth Circuit has not addressed the issue, every circuit court confronting national service statutes has held that minimum

contacts with the United States are sufficient to justify the assertion of personal jurisdiction. *See, e.g., Bellaire Gen. Hosp. v. Blue Cross Blue Shield,* 97 F.3d 822, 826 (5th Cir.1996); *United Liberty Life Ins. Co. v. Ryan,* 985 F.2d 1320, 1330 (6th Cir.1993); *United Elec. Workers v. 163 Pleasant Street Corp.,* 960 F.2d 1080, 1085 (1st Cir.1992); *Diamond Mortgage Corp. v. Sugar,* 913 F.2d 1233, 1244 (7th Cir.1990); *Go–Video, Inc. v. Akai Elec. Co., Ltd.,* 885 F.2d 1406, 1414–16 (9th Cir.1989); *Texas Trading v. Federal Republic of Nigeria,* 647 F.2d 300, 314–15 (2d Cir.1981). The overwhelming majority of cases in this district also have employed a national contacts standard. *See, e.g., McCracken,* 891 F.Supp. at 561; *In re Atteberry,* 159 B.R. 1, 5 (D.Kan.1993); *Monarch Normandy v. Normandy Square,* 817 F.Supp. 899, 902 (D.Kan.1993); *Hubert,* 678 F.Supp. 1500–08. *But see Wichita Federal Sav. & Loan Ass'n v. Landmark Group, Inc.,* 657 F.Supp. 1182, 1194–95 (D.Kan.1987).

*Nevada Boiler Works,* 1997 WL 94241 at *4. The Court then held that only minimum contacts with the United States are necessary to exercise personal jurisdiction over a defendant in a suit involving a national service of process statute.

■ Since the Court's ruling, the Tenth Circuit has decided *Peay v. BellSouth Medical Assistance Plan,* 205 F.3d 1206 (10th Cir. 2000). In *Peay,* the Tenth Circuit found that "in a federal question case where jurisdiction is invoked based on nationwide service of process, the Fifth Amendment requires the plaintiff's choice of forum to be fair and reasonable to the defendant." *Peay,* 205 F.3d at 1212. Noting that technology has lessened the burdens of litigating in a distant forum, however, the Tenth Circuit emphasized that it is "only in highly unusual cases that inconvenience will rise to a level of constitutional concern." *Peay,* 205 F.3d at 1212–13 (quoting *Republic of Panama v. BCCI*

*Holdings (Luxembourg) S.A.*, 119 F.3d 935, 947 (11th Cir.1997)).

■ To establish a violation of due process under the Fifth Amendment, defendant must demonstrate an infringement of her liberty interests. Defendant bears the burden to show that the exercise of jurisdiction in the chosen forum will "make litigation so gravely difficult and inconvenient that [she] unfairly is at a severe disadvantage in comparison to [her] opponent." *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)). In determining whether defendant has met this burden, the Court considers the following factors:

(1) the extent of the defendant's contacts with the place where the action was filed; (2) the inconvenience to the defendant of having to defend in a jurisdiction other than that of his residence or place of business, including (a) the nature and extent and interstate character of the defendant's business, (b) the defendant's access to counsel, and (c) the distance from the defendant to the place where the action was brought; (3) judicial economy; (4) the probable situs of the discovery proceedings and the extent to which the discovery proceedings will take place outside the state of the defendant's residence or place of business; and (5) the nature of the regulated activity in question and the extent of impact that the defendant's activities have beyond the borders of his state of residence or business.

*Peay*, 205 F.3d at 1212 (quoting *Oxford First Corp. v. PNC Liquidating Corp.*, 372 F.Supp. 191, 203 (E.D.Pa.1974)).

■ If defendant successfully demonstrates that litigation in this forum is unduly inconvenient, then "jurisdiction will comport with due process only if the federal interest in litigating the dispute in the chosen forum outweighs the burden imposed on the defendant." *Peay*, 205 F.3d at 1213 (quoting *Republic of Panama*, 119 F.3d at 948). To determine whether infringement on the defendant's liberty is

justified sufficiently by government interests,

courts should examine the federal policies advanced by the statute, the relationship between nationwide service of process and the advancement of these policies, the connection between the exercise of jurisdiction in the chosen forum and the plaintiff's vindication of his federal right, and concerns of judicial efficiency and economy. Where ... Congress has provided for nationwide service of process, courts should presume that nationwide personal jurisdiction is necessary to further congressional objectives.

*Peay*, 205 F.3d at 1213 (quoting *Republic of Panama*, 119 F.3d at 948).

■ In the instant case, plaintiffs have produced evidence sufficient to overcome Sandra's motion for summary judgment as to whether she is liable as an alter ego of Tank Maintenance. Certainly jurisdiction over Sandra would not violate due process if she is, in fact, its alter ego. As such, the Court finds plaintiffs' evidence sufficient to make a prima facie showing of personal jurisdiction.

Sandra also asserts, however, that this Court lacks personal jurisdiction because plaintiffs failed to effect proper service of process. Sandra points to affidavit evidence that in December 1999 plaintiffs served her with a copy of the second amended complaint without a summons attached. Fed.R.Civ.P. 4(m) directs that "[i]f service of the summons and complaint is not made upon a defendant within 120 days after the filing of the complaint, the court, upon motion or on its own initiative after notice to the plaintiff, shall dismiss the action without prejudice or direct that service be effected within a specified time." Sandra asserts that because the summons was not served upon her, service of process was defective and the Court should dismiss the claims against her. But plaintiffs point to evidence that the process server served Sandra with both a summons and a copy of the complaint.

Therefore plaintiffs have made a prima facie showing which is sufficient to overcome dismissal at this time.

## 2. Alter Ego Claims

### A. Individual Defendants

The Tenth Circuit has not set a standard for piercing the corporate veil on an alter ego theory in an ERISA delinquent contributions recovery action. The parties, however, cite *NLRB v. Greater Kansas City Roofing*, 2 F.3d 1047, 1052 (10th Cir.1993), as the applicable standard. In *Greater Kansas City Roofing*, the National Labor Relations Board ("NLRB") sought to recover from a shareholder an unfair labor practice judgment against the corporation. In determining whether to pierce the corporate veil, the Tenth Circuit applied the following two-part test:

> (i) was there such unity of interest and lack of respect given to the separate identity of the corporation by its shareholders that the personalities and assets of the corporation and the individual are indistinct, and (ii) would adherence to the corporate fiction sanction a fraud, promote injustice, or lead to an evasion of legal obligation.

*NLRB v. Greater Kansas City Roofing*, 2 F.3d 1047, 1052 (10th Cir.1993). This test is similar to the standard which other circuits have applied in ERISA contribution cases against individual defendants. *See, e.g., Contractors, Laborers, Teamsters & Engineers Health and Welfare Plan v. Hroch*, 757 F.2d 184, 191 (8th Cir.1985) (president liable as alter ego where he used corporate form in inequitable fashion to avoid corporate obligations and avoiding judgment would result in fraud against trusts); *Laborers' Pension Trust Fund v. Sidney Weinberger Homes, Inc.*, 872 F.2d 702, 705 (6th Cir.1988) (considering three

factors on alter ego claim against individual: (1) the amount of respect the shareholders gave the separate corporate entity; (2) the degree of injustice visited on litigants by recognition of the corporate entity, and (3) the fraudulent intent of the incorporators);[19] *Alman v. Danin*, 801 F.2d 1, 4 (1st Cir.1986) (same); *Lumpkin v. Envirodyne Ind., Inc.*, 933 F.2d 449, 461 (7th Cir.1991) (same); *Board of Trustees of Mill Cabinet Pension Trust Fund For Northern California v. Valley Cabinet & Mfg. Co.*, 877 F.2d 769, 772 (9th Cir.1989) (same); *Crane v. Green & Freedman Baking Co.*, 134 F.3d 17, 22 (1st Cir.1998) (noting that of the three elements, a finding of some fraudulent intent is necessary). Accordingly, the Court finds that the Tenth Circuit would apply the *Greater Kansas City Roofing* test to plaintiffs' alter ego claims against the individual defendants in this case.

In applying the first prong of the test, the Court considers (1) the degree to which defendants have maintained corporate legal formalities, and (2) the degree to which defendants have commingled individual and corporate assets. *Greater Kansas City Roofing*, 2 F.3d at 1052. In determining whether the corporation and stockholders have maintained separate identities, the Court looks to the following factors:

> (1) whether a corporation is operated as a separate entity; (2) commingling of funds and other assets; (3) failure to maintain adequate corporate records or minutes; (4) the nature of the corporation's ownership and control; (5) absence of corporate assets and undercapitalization; (6) use of a corporation as a mere shell, instrumentality or conduit of an individual or another corporation; (7)

---

**19.** In *Greater Kansas City Roofing*, the Tenth Circuit noted that other circuits applied three factors and noted that "the second and third factors are really just commonly incurred variations on the equitable theme addressed in the second prong of [the Tenth Circuit's] test." 2 F.3d at 1054. The court found that it was not necessary to require both fraud and

injustice, noting that it is sufficient for plaintiff to show that "there is a compelling equitable reason for the court to expose the shareholder to personal liability in the form of fraud, injustice, or evasion of legal obligations flowing from the disregard of the separate corporate identity." *Id.*

disregard of legal formalities and the failure to maintain an arms-length relationship among related entities; and (8) diversion of the corporation's funds or assets to noncorporate uses.

*Van Diviner*, 822 F.2d at 965.

Defendants did not keep corporate records or minutes, nor did they keep records of business expenses which they personally incurred or personal expenses which the companies paid. Both companies paid home mortgage and personal credit card expenses for Gendron and Sandra, and Tank Maintenance paid full rent for Jon–Michael's building when it occupied only the upstairs office. Northeast Services paid Jon–Michael full rent when it used only the basement for storage. In addition, Gendron and Sandra manipulated the payrolls of both companies to avoid an IRS levy on Gendron's wages, and Sandra loaned her personal car to a Northeast Services employee in lieu of providing a pay raise. On this record, it is obvious that defendants have not maintained corporate formalities. Rather, they have commingled individual and corporate assets to a degree that the personalities and assets of Tank Maintenance and Northeast Services are indistinct from those of the individual defendants.

■ The second prong of the alter ego test requires an element of unfairness, injustice, fraud or other inequitable conduct. Specifically, plaintiffs must show that defendants acted with intent to avoid payment to plaintiffs, or that their disregard of corporate formalities caused the companies to be less able to pay plaintiffs or otherwise caused injustice. *See Greater Kansas City Roofing*, 2 F.3d at 1055. Although actual fraud is not required, plaintiffs must show that some injustice or inequity will result from recognizing the corporate entity. *See United States v. Van Diviner*, 822 F.2d 960, 964–65 (10th Cir.1987). "It is only when the shareholders disregard the separateness of the corporate identity and when that act of disregard causes the injustice or inequity or constitutes the fraud that the corporate

veil may be pierced." *Greater Kansas City Roofing*, 2 F.3d at 1053.

Plaintiffs assert that the second prong is met solely by the fact that this is an ERISA case and congressional policy favors piercing the corporate veil. Although the cases which plaintiffs cite contain broad language concerning ERISA policy, all of the courts found that an element of fraud resulted from the actions of the individual defendants. *See Hroch*, 757 F.2d at 191 (defendant used corporate form in inequitable fashion to avoid its obligations and avoiding judgment would result in fraud against trusts); *Alman*, 801 F.2d at 4 (because individual defendants could not have expected undercapitalized company to pay its debts, court inferred they acted in bad faith in their dealings with union); *Lumpkin*, 933 F.2d at 460–61 (articulating test requiring fraud or injustice). *See also Sidney*, 872 F.2d at 705 (clear evidence that fraud may have occurred). The Court thus declines to find that as a matter of law, plaintiffs have satisfied the second prong merely because their case seeks recovery of ERISA contributions.

Defendants argue that plaintiffs cannot satisfy the second prong of the test. Specifically, defendants assert that plaintiffs have no evidence that they acted with intent to avoid union obligations or that their actions had a negative effect on plaintiffs' ability to collect the debt. In *Greater Kansas City Roofing*, the Tenth Circuit found that the NLRB was not entitled to pierce the corporate veil, even though defendant had not adhered to corporate formalities, because the record contained no evidence that defendant had acted with fraudulent intent or that her disregard of corporate formalities had caused the company to be any less able to pay the judgment or otherwise caused injustice. Defendant had loaned money to a company which her sister-in-law owned. When it appeared that the company could not repay the loan, defendant set up a new corporation and ran the business herself. Defendant transferred the assets of the old

business to the new company, took over existing customers, and retained the same employees. At the time, defendant did not know that the previous company had committed unfair labor practices or that the NLRB had a judgment against it. In running the new company, defendant failed to adhere to corporate formalities. Despite the "careless" manner in which defendant conducted the business, the Tenth Circuit found that she was not personally liable for the NLRB judgment because her sloppy business practices were not linked to any fraud, injury or injustice to the employees of the former company. *Greater Kansas City Roofing,* 2 F.3d at 1055. Specifically, the Tenth Circuit found no evidence that defendant looted the assets of the new company to avoid payment of the back pay award, or that her disregard of corporate formalities caused the new company to be any less able to respond to the back pay order or otherwise caused injustice. *Greater Kansas City Roofing,* 2 F.3d at 1055.

Unlike the defendant in *Greater Kansas City Roofing,* the record supports an inference that the individual defendants in this case had notice of the potential union obligation, at least by the time of the *Tank Maintenance I* litigation and that defendants started Northeast Services in an attempt to avoid that obligation. Moreover, a jury might reasonably infer that the individual defendants looted corporate assets. The present record is unclear with respect to the extent of defendants' commingling or its effect on the companies' abilities to pay the union obligation. The Court thus finds that questions of fact remain as to whether defendants disregarded corporate formalities and commingled assets in attempt to avoid the union obligation or whether their actions in fact had such an effect. The parties' cross motions for summary judgment therefore should be overruled with respect to the alter ego claims against the individual defendants.

**B. Northeast Services**

It is unclear whether the Tenth Circuit would apply the same test to plaintiffs' alter ego claims against Northeast Services. In *Greater Kansas City Roofing,* the court stated that its opinion did not address a disguised continuance or successor corporation, noting that such a case "presents different issues regarding when liability of one entity should be shared by a second entity than does the case where corporate liability is sought to be imposed upon a controlling shareholder." *Greater Kansas City Roofing,* 2 F.3d at 1054 n. 9. Some courts distinguish between the "corporate law standard" and "labor law standard" for finding alter ego liability against a successor corporation. "The focus of the labor law alter ego doctrine is on the existence of a disguised continuance of a former business entity or an attempt to avoid the obligations of a collective bargaining agreement." *Superior General Contractors,* 104 F.3d at 1055 (quotations and citations omitted); *see also NLRB v. Fullerton Transfer & Storage Ltd.,* 910 F.2d 331, 336 (6th Cir.1990). The circuit courts disagree, however, whether the labor law alter ego standard requires plaintiff to show anti-union intent by the second employer. *See Fullerton,* 910 F.2d at 337 n. 9. In the Tenth Circuit, a finding of anti-union animus is more likely to result in piercing the corporate veil, but it is not necessary. *NLRB v. Tricor Prods., Inc.,* 636 F.2d 266, 270 (10th Cir.1980).

Except for the Eighth Circuit, *see Superior General Contractors, Inc.,* 104 F.3d at 1055 (requiring control by one company over the other), it appears that those circuits which have addressed the issue have applied the labor law standard for piercing the corporate veil to collect ERISA benefit contributions from a second employer. *See Massachusetts Carpenters Central Collection Agency v. Belmont Concrete Corp.,* 139 F.3d 304, 308 (1st Cir.1998) (considering various factors including continuity of ownership, similari-

ty of management, business purpose, operation, equipment, customers, supervision and anti-union animus, finding that no one factor is necessary); *Brick Masons Pension Trust v. Industrial Fence & Supply, Inc.*, 839 F.2d 1333, 1336 (9th Cir.1988) (looking at similar factors, noting that critical inquiry is whether employer uses non-union company in sham effort to avoid union obligations); *Central States, Southeast and Southwest Areas Pension Fund v. Sloan*, 902 F.2d 593, 596–97 (7th Cir. 1990) (same); *Carpenters Local Union No. 1846 Of United Brotherhood Of Carpenters And Joiners Of America, AFL—CIO v. Pratt-Farnsworth, Inc.*, 690 F.2d 489, 507–08 (5th Cir.1982) (same). The Court agrees, and finds that the Tenth Circuit would apply *Tricor* to plaintiffs' alter ego claims against Northeast Services.

In *Tricor*, the Tenth Circuit found that two businesses may be bound by a collective bargaining agreement if one is the alter ego of the other. *Id.* at 269–70. The Tenth Circuit found that determining whether a second employer is a mere successor to the first employer—versus its alter ego—involves consideration of numerous factors. *Tricor*, 636 F.2d at 270. "There is no hard-and-fast rule." *Id.* In finding sufficient evidence to support an alter ego finding, the Tenth Circuit looked at various factors. First it noted that an employer was more likely to be an alter ego if it made the change in business operation to deliberately get rid of the union, rather than for legitimate economic reasons. Second, it found an employer was more likely to be an alter ego if it continued with substantially the same employees as the first employer. Finally, it looked to the relationship between ownership and management of the companies, noting that closely related factors were continuity of equipment and location, retention of accounts and customers, changes in the type and amount of work performed, and assumption of the predecessor's liabilities. *Tricor*, 636 F.2d at 270.

Plaintiffs argue that defendants established Northeast Services in order to avoid the Tank Maintenance obligation to the union. Defendants maintain that Jon–Michael started the company in an effort to separate non-covered pipe work from tank work performed by Tank Maintenance. While this may have been Jon–Michael's initial intent, the undisputed facts establish that Northeast Services did not restrict its operations to pipe work. Northeast Services performed tank work under a "subcontract" with Tank Maintenance, and it allowed Gendron to submit a proposal on its letterhead and perform the Duck Island tank job at a time when he was not even employed by Northeast Services. Moreover, the fact that Northeast Services was created in the midst of the *Tank Maintenance I* litigation supports an inference of intent to avoid the union obligation. Questions of fact remain regarding details of the interaction between the companies, including the amount of equipment which Northeast Services purchased from Tank Maintenance and the reasonable value thereof; when Northeast Services began performing tank work and how much tank work it performed; the overlap of employees; and the ownership and management structure of Tank Maintenance and Northeast Services. The Court thus finds that both parties' motions for summary judgment should be overruled with respect to the alter ego claims against Northeast Services.

**IT IS THEREFORE ORDERED** that *Defendant Sandra Gendron's Motion To Dismiss, Or, In The Alternative, Motion For Summary Judgment* (Doc. # 83) filed February 28, 2000 be and hereby is OVERRULED; *Plaintiffs' Motion For Summary Judgment* (Doc. # 86), filed February 28, 2000 be and hereby is OVERRULED; and *Defendants Theodore G. Gendron, Jon–Michael Gendron, And Northeast Service And Inspections, Inc. [sic] Motion For Summary Judgment Or, In The Alternative, For Partial Summary Judgment* (Doc. # 94) filed March 7, 2000 be and hereby is OVERRULED.